The Chautauque County Bank v. White.

---

---

SAME TERM.    *Harris, Watson, and Parker*, Justices.

THE CHAUTAUQUE COUNTY BANK *vs.* WHITE.

A common law receiver is a person appointed by the court to receive the rents, issues and profits of land, or any other thing in question in the court of chancery, pending a suit, where it does not seem reasonable to the court that either party should receive them.

He is appointed to protect some fund during the litigation, and has no powers, except such as are conferred by the order for his appointment, and the course and practice of the court.

The court of chancery has no power, upon a creditor's bill, to order the *real estate* of a judgment debtor to be sold to satisfy the judgment.

Nor will an assignment of all his property, real and personal, to a receiver, executed by the judgment debtor under and in obedience to an order of the court, vest the legal title to the real estate in the receiver, so as to authorize the court to direct him to sell such real estate and apply the proceeds to the payment of creditors having liens thereon.

Such an assignment will not so effectually divest the judgment debtor of his title

The Chautauque County Bank *v.* White.

to the real estate as to prevent a judgment subsequently recovered against him from becoming a lien thereon.

And the purchaser at a sale under such judgment will acquire a legal title to the real estate of the debtor; notwithstanding a sale of such property by the receiver in the creditor's suit, made in pursuance of an order of the court.

If the purchaser at the receiver's sale has received a conveyance of the premises, the person purchasing the property at the sale under the judgment has a right to the aid of the court of chancery to remove the cloud cast upon his title by the conveyance from the receiver.

A person who, being himself the owner of property, stands by and sees another sell it as his own, without objection, will not be allowed afterwards to assert his title. His silence, when, in good conscience, he ought to speak, shall close his mouth when he would speak.

Accordingly, where a person, at a receiver's sale of real estate, represented, or induced the receiver to represent, that the property was encumbered greatly beyond its utmost value, and that he who purchased would acquire only the right to the use of the property until a legal title could be perfected under the incumbrances; by means of which representations all competition was prevented and such person purchased the property at a merely nominal price; *Held* that he was concluded by the representations made by him, and estopped from denying that the judgments mentioned at the receiver's sale were then existing liens upon the land purchased by him.


In Equity. On the 19th of September, 1837, John Z. Saxton, having been extensively engaged in mercantile and other business, and being insolvent, made an assignment of his property to Pearson Crosby and John Crane, in trust for the payment of his debts. By the terms of the assignment the debts to be paid were divided into four classes, which were to be paid in the order specified. The first class amounted to $5523,00, and embraced two notes due to the plaintiffs, amounting to $2800. The second class consisted of all other debts which Saxton had contracted on his own account, and was estimated at $14,548,-87. The third and fourth classes included his liabilities for others. On the first day of October, 1837, Saxton conveyed to his assignees all his real estate, in trust for the same purposes expressed in his assignment.

On the 4th of November, 1837, Webb & Douglass, creditors of Saxton, whose debt was included in the second class, recovered a judgment against him in the supreme court for $646,32. On the 28th of September, 1838, they filed a bill in chancery

against Saxton and his assignees, to set aside the assignment and trust deed, on the ground that the same were fraudulent and void. The bill having been taken as confessed by the defendants therein, a decree was made on the first day of November, 1838, declaring the assignment of the 19th of September, 1837, fraudulent and void, and directing the appointment of a receiver, *with the usual powers and authority,* and that the defendant Saxton assign, transfer, and deliver over, on oath, to such receiver, all the money, equitable interests, property, things in action, rents, real estate and effects, which were in his possession, custody or control at the time of the service of the injunction upon him, except such property as was by law exempt from execution ; and also that the defendants Crosby and Crane assign, transfer and deliver over to the receiver, all the money, equitable interests, property, things in action, rents, real estate and effects held by them, under any assignment or deed in trust executed to them by Saxton ; and that the receiver, out of the moneys he should receive, should pay the amount of the judgment and the complainants' costs. On the 19th of December, 1838, the decree was vacated as to the assignees, and they were let in to defend the suit. Ebenezer A. Lester was appointed a receiver under the decree of the first of November, and on the 5th of January, 1839, Saxton executed an assignment to the receiver pursuant to the decree *" to have and to hold the property assigned to the receiver according to the said decree and order and the laws of this state."* On the 19th of June, 1839, an order was made directing John Crane, one of the assignees, to transfer to the receiver all the property and effects in his hands as assignee ; in pursuance of which, on the 9th of September, 1839, he executed to the receiver an assignment of all the property claimed by him under the assignment of the 19th of September, 1837, or the deed of trust of the first of October. Crane put in an answer, and the bill was again taken as confessed by the defendant Crosby, he having removed from the state. The cause having been heard by Vice Chancellor Cushman, a decree was made on the 29th of February, 1840, declaring the assignment and deed of trust *fraudulent and void,* and

*directing* the receiver to "advertise and sell for cash, at public auction, the real estate conveyed or assigned to him under said orders, *subject to the liens and incumbrances thereon*, at the risk of the purchaser, on giving six weeks' notice," &c.; and that the receiver convert the personal property into money and apply the proceeds of said real and personal estate "to the satisfaction of the decrees of the respective complainants according to the priority of the filing of their respective bills, in suits in which he had been, or should be, appointed receiver."

On the 2d of June, 1838, Charles Barker recovered against Saxton and others a judgment for $557,12. And on the 3d of November, in the same year, he also filed a bill against Saxton and the assignees, to set aside the assignment; and, the suit having been ordered to abide the event of the suit in which Webb & Douglass were complainants, a decree was made on the 9th of April, 1840, similar in all its provisions to that made in the case of Webb & Douglass.

On the 6th of May, 1839, five other judgments were recovered against Saxton, by other creditors, amounting in the aggregate to $3323,71. And on the 11th of May, 1839, the plaintiffs in these judgments also filed a bill to set aside the assignment, and on the 9th of April, 1840, a decree was entered in that suit declaring the assignment and deed of trust fraudulent and void, and containing the same directions and provisions as the decrees in the other suits. The defendant in this suit was the solicitor for the complainants in all the bills filed against Saxton and his assignees, and attorney for the plaintiffs in all the judgments except that of Webb & Douglass.

On the 25th of March, 1840, the receiver published a notice, entitled in the suit of Webb & Douglass, stating that, as receiver in that suit, he would sell at public auction, on the 7th of May, certain lands, describing the real estate of Saxton, "*which sale was to be entirely for cash, and the lands sold subject to the liens and incumbrances thereon, at the risk of the purchasers.*" The notice was prepared by the defendant, and sent to the receiver, with instructions to sell the real estate at the earliest possible day. Preparatory to the sale, a certificate of one of the

clerks of the supreme court was procured, containing a statement of judgments against Saxton. The aggregate amount of the judgments mentioned in the certificate was $19,451,37. Of these judgments, one in favor of the plaintiffs in this suit against Saxton and others for $1260 was docketed prior to the execution of the assignment by Saxton. Three other judgments, besides those in favor of Webb & Douglass and Charles Barker, amounting to $878,84, were docketed between the time of the assignment by Saxton to Crosby and Crane and his assignment to the receiver. Four other judgments, including one in favor of the plaintiffs in this suit for $2236,67, and together amounting to $4936,16, were docketed on the 7th of January, 1839. At the sale the receiver read his printed notice of sale and that portion of the decree which required him to sell subject to liens, and stated publicly that he should sell subject to previous liens, and exhibited the clerk's certificate *as containing a statement of such liens.* A share of stock in the Van Buren Harbor Company, and two lots which had been conveyed to the assignees in payment of a debt, were sold separately, and purchased by the defendant for $85. The residue of the real estate, consisting of various village lots and other parcels of land, were sold together and bid off by the defendant for $238. The defendant was the only bidder. It was understood by the defendant and the receiver, at the time of the sale, that the judgment for $1260 docketed prior to the assignment was against Crosby as principal and Saxton as surety, and that it would be collected of Crosby. It was also understood that another judgment appearing upon the certificate for $137,55 was paid. They made an estimate of the amount of the liens upon the property. The amount prior to the 8th of January, 1839, was about $7000. They concluded that the property was not worth more than the liens upon it. They then estimated what the use of the property would be worth for 15 months, the period which would elapse before a purchaser at a sheriff's sale would acquire title. The defendant bid about the amount of this estimate. In making up the amount of the liens upon the property the judgment of $2236,67 in favor of the plaintiffs was considered by the re-

ceiver and the defendant as a lien upon the property. A witness testified that, at the time of the sale, he understood from
both the receiver and the defendant that the purchaser would
only get the right to the use of the property some 15 months.
A letter was also produced in evidence, written by the defendant to the receiver, under date of April 4, 1840, which contains
a copy of what the defendant calls " Crane's sworn valuation
of the real estate." It amounts to $4612. He then proceeds
to say, " If this valuation be true, as I think it is, it will be *mere
form* for you to sell it, as it is worth nothing above the judgments, which are liens upon it, beyond the value of the use of
it for one year, as the purchaser can hold it only as long as
Saxton could after a sale by the sheriff on an execution. So
the whole real estate will remain after your sale, a *bone* for the
creditors who will redeem over each other until it is run up to
about $4612, or such other amount as it is supposed to be
worth. This being the case, you will put up the whole together, and it will bring its value *to use* for one year, which ought
to be as much as four or five hundred dollars. I am getting a
transcript of all judgments in the supreme court against Saxton,
and you would do well to get those in the county clerk's office,
*so that purchasers may know all the liens.* You need only get
a search since August, 1837, as then Saxton cleared off all incumbrances to get some of the surplus loan." On the 11th day
of May, 1840, the receiver executed to the defendant a deed,
containing recitals setting forth the various proceedings in the
suit of Webb & Douglass against Saxton and his assignees,
and conveying to the defendant, his heirs and assigns, the real
estate purchased by him at the sale. When the decree in favor
of Barker was entered, on the 9th of April, 1840, the receiver
had in his hands money more than sufficient to pay that decree
and the decree in favor of Webb & Douglass. The amount
due Webb & Douglass upon their judgment had been paid by
the receiver, on the 9th of March, 1840 ; and the costs of the
suit in chancery were paid on the day of the receiver's sale.
The whole amount paid by the receiver upon the three decrees
was $4243,76. On the first day of April, 1840, the sheriff of

Chautauque advertised the same lands described in the receiver's notice of sale, to be sold, under an execution issued upon a judgment for $393,12, recovered by one Morris Adams against Saxton on the 27th of July, 1838. The sale took place on the 30th of May, when the defendant in this suit bid off a portion of the premises for $450, a sum sufficient to satisfy the execution. The plaintiffs in this suit subsequently redeemed the property thus purchased by the defendant. On the 18th of July, 1840, all the premises purchased by the defendant at the receiver's sale, except the lot sold on the 30th of May by virtue of the execution in favor of Morris Adams, were sold under an execution issued upon the plaintiff's judgment recovered on the 7th of January, 1839, and purchased by the plaintiffs for $2000, and on the 14th of January, 1842, they received a sheriff's deed of the premises so purchased.

On the 26th of August, 1841, the defendant paid $169,41 in satisfaction of a judgment recovered by Albert H. Porter against Saxton on the 7th of May, 1838, and on the 9th of September, 1841, the defendant obtained an assignment of another judgment recovered by Lewis Peck and John P. Redner on the 7th of May, 1838, for $348,17. The judgment for $1260 in favor of the plaintiffs, docketed on the 8th of July, 1837, was satisfied on the 19th of March, 1841, by a sale of Crosby's property. A mortgage executed by Saxton upon one of the lots purchased by the defendant at the receiver's sale had been foreclosed, and the premises sold on the 2d day of December, 1839. On the 12th of January, 1842, the defendant paid to the purchaser $179,07, and received a conveyance of the lot so sold.

The plaintiffs filed their bill on the 17th of August, 1842, praying that their judgment might be decreed to be a lien upon the premises purchased by them, from the time it was docketed, and that their title under the sheriff's sale might be declared superior to the defendant's title derived from the receiver; and further, that the defendant might be required to surrender the possession of the premises to the plaintiffs, and account for and pay over to the plaintiffs the rents and profits of the premises from the time they became entitled to the possession.

The defendant put in his answer in which he claimed that by virtue of his conveyance from the receiver he acquired the legal title to the premises, and claimed protection as a bona fide purchaser. The case was heard upon pleadings and proofs, by the vice chancellor of the third circuit, who, on the 2d day of August, 1844, made a decree dismissing the plaintiff's bill with costs. From this decree the plaintiffs appealed.

*C. Tucker*, for the plaintiffs.

*M. T. Reynolds*, for the defendant.

HARRIS, J. by the terms of the sale, under which the defendant claims title to the premises in question, the purchaser was to take his title subject to the liens and incumbrances thereon. And that those who attended the sale might be apprised of the extent of such incumbrances, a schedule of judgments was exhibited, to the amount of about $20,000. The sale was conducted under the direction of the defendant ; and it must be presumed that it was with his knowledge and approbation that those present at the sale were informed, that the purchaser of the lands to be sold, must take the property charged with this formidable amount of judgments. The defendant must himself admit, that when he purchased he supposed all these incumbrances actually existing and chargeable upon the property. This conclusion is necessary, for the vindication of his integrity in the transaction. For, if he then believed that the purchaser would hold the premises subject only to the lien of such judgments as had been docketed prior to the assignment by Saxton to the receiver, it was a gross fraud for him to have it understood by all attending the sale, except himself, that all the judgments then outstanding against Saxton, were incumbrances upon the property. The defendant knew then, that Crosby was primarily liable for the payment of the $1260, for which judgment had been recovered against Saxton. He knew that the Webb & Douglass judgment had, in fact, been paid. He also knew that the receiver then had actually in

The Chautauque County Bank *v.* White.

hand, money much more than sufficient to satisfy the Barker judgment. So that if the position now assumed by the defendant, that no judgments docketed after the assignment by Saxton to the receiver, became liens upon the property, be sustainable, the only real incumbrances to be paid out of the property as prior liens thereon were three small judgments, amounting together to less than $900. If this were so, and the defendant knew or believed it, he was bound in fairness to have had those who attended the sale, correctly informed in respect to the nature and extent of the incumbrances. At the least, he was bound to see that they were not incorrectly informed.

But I think the defendant took a more correct view of the question, in his letter of the 4th of April, 1840, than he seems to have entertained since he became the purchaser. He then believed, and acted upon the belief, so at least I must assume, that all the judgments which had been recovered against Saxton, were liens upon the real estate. Hence he said to the receiver, that it would be *mere form* for him to sell; that the property was worth nothing above the judgments, except the value of the use of it, until a title could be perfected under a sheriff's sale; and that after the sale by the receiver, the whole real estate would remain "*a bone*" for creditors, who would redeem over each other, until it should be run up to the amount of $4612, or such other amount as it might be supposed to be worth. I am inclined to concur with the defendant in the correctness of this opinion. The receiver was, what Chancellor Walworth, in *Verplanck v. The Mercantile Insurance Co.* (2 *Paige*, 452,) called a common law receiver. Such a receiver is defined to be a person appointed by the court, to receive the rents, issues and profits of land or any other thing in question in the court of chancery, pending a suit, where it does not seem reasonable to the court that either party should do it. ( *Wyatt's Prac. Reg.* 355.) He is appointed to protect some fund during the litigation, and has no powers, except such as are conferred by the order for his appointment, and the course and practice of the court. (2 *Paige*, 452, *above cited.*)

I propose, therefore, in the first instance, to inquire what has

The Chautauque County Bank *v.* White.

been the course and practice of the court of chancery, in this state, and what is the power conferred upon it by law in such cases, with a view to a correct determination of the question, whether the judgments recovered after the assignment to the receiver, were in fact liens.

In *Hadden* v. *Spader*, (20 *John.* 554,) the doctrine, which had previously been held by Chancellor Kent, was settled by the court for the correction of errors, that a judgment creditor, whose execution had been returned unsatisfied, might file his bill in chancery, to have his judgment satisfied out of the equitable interests of the debtor which could not be reached by execution, and that the commencement of such a suit gave the creditor a lien upon such equitable estate of the debtor. In *Edmeston* v. *Lyde*, (1 *Paige*, 637,) the chancellor extended this principle, so as to reach an equitable interest of the debtor in real estate. This decision was made just before the revised statutes took effect. The doctrine of *Hadden* v. *Spader* having been questioned in *Donovan* v. *Finn*, (1 *Hopkins* 59,) the revisers, with a view as they state, to preserve the rule as laid down in that case, proposed to introduce it into the statutes. Two sections were accordingly reported, which provided for the filing of a bill upon the return of an execution unsatisfied, " to compel the discovery of any property, or thing in action, belonging to the defendant, and of any property, money or thing in action, due to him or held in trust for him, and to prevent the transfer of any such property, money, or thing in action, or the payment or delivery thereof to the defendant," and further declaring that " the court should have power *to decree satisfaction, &c. out of any property, money, or things in action, belonging to the defendant,* or held in trust for him, which should be discovered by the proceedings in chancery, whether the same were originally liable to be taken in execution or not. The legislature amended the latter section as prepared by the revisers, by inserting the word "*personal*" before "*property,*" and as thus amended, adopted it. The fact that the court is thus authorized, in terms, to decree satisfaction, &c. out of *personal property*, would probably of itself be sufficient to justify the in-

ference that it was not intended to confer the same power in relation to real estate. The maxim that *expressio unius est exclusio alterius*, would, I think, be applicable in the construction of the section, and restrict the court to the terms of the statute. But however this may be, the fact that the legislature, when the provision was presented to them in terms broad enough to embrace real estate, inserted the word *"personal,"* shows, I think, very satisfactorily, that it was not intended that the court of chancery should have the power to decree satisfaction of a judgment out of the *real estate* of the debtor. (*See* 2 *R. S.* 174, § 38, 39, *and Revisers' report.*) There was no necessity for conferring such a power. If the debtor interposed fraudulent obstructions in the way of the satisfaction of his judgment creditor by a sale of his real estate upon execution, the creditor might resort to the court of chancery to aid him in removing such obstructions. This being done, the property might be sold upon execution, and the right of redemption preserved to the defendant and other creditors. Ever since the passage of the redemption act, in 1820, it has been the policy of the legislature to preserve and extend its beneficial effects. It would not therefore, adopt a provision which, as has been attempted in the case now before the court, might enable the creditor, by resorting to a court of chancery, to become the purchaser of his debtor's real estate at an absolute sale for a nominal price, at the expense of other creditors. The benign operation of the law allowing a right of redemption for a limited period after the sale of real estate, is well and forcibly stated by the chancellor, in *Farnham* v. *Campbell*, (10 *Paige*, 598.)

The course and practice of the court of chancery will be found to correspond, uniformly I think, with the power thus conferred by the legislature. The court has never, within my experience, asserted its power to decree the sale of the real estate of a judgment debtor to satisfy the judgment. In a case which recently came before this court, at a general term in the fifth judicial district, Mr. Justice Gridley holds the following language : " It is not within the scope and object of a creditor's bill, properly so called, to direct a sale of the real estate of the judgment debtor.

Its object is to compel the 'discovery of any property, or thing in action, belonging to the defendant, and to prevent the transfer of such property ;' and the court is authorized by the statute, to compel such discovery, to prevent such transfer, and ' *to decree satisfaction* of the judgment out of any *personal property, money* or things in action, belonging to the defendant or held in trust for him.' The term ' land,' or ' real estate,' is not found in the act. When, however, there is any impediment, such as a fraudulent conveyance, interposed to prevent the collection of a debt, so as to give the party a right to invoke the jurisdiction of the court of chancery in aid of an execution at law, it is allowable to embrace this ground of relief also in a creditor's bill. The legitimate relief upon such a bill, so far as the real estate is concerned, is attained when the unlawful obstruction is removed, and the creditor is thus enabled to obtain satisfaction of his judgment by a sale under an execution at law. The provisions of the revised statutes already adverted to, were merely declaratory of the powers which the court of chancery possessed and had exercised before their enactment." (*Scouten* v. *Bender*, 3 *Howard's Sp. T. Rep.* 185. And see *Hendrickson* v. *Winne, Id.* 127.) It is true that Justice Gridley adds, in his opinion, that he does not doubt that the court may, in some cases, lawfully direct a sale of the real estate of the judgment debtor, and that in many instances it is the most advisable course to be pursued. I shall have occasion to notice this remark more particularly presently. *Tompkins* v. *Fonda*, (4 *Paige*, 448,) presented the same question. An application was made for a receiver upon a creditor's bill. The only property of the defendant was her interest in a farm of which her husband had died seised. Her dower had never been demanded or assigned to her. The only question presented to the court for its decision, was whether this was such an interest as could be reached by the aid of the court of chancery, after the return of an execution unsatisfied. The court held that the defendant's interest in the land of her deceased husband, before assignment, was not an estate which could be sold upon execution, but was a mere right or chose in action, and therefore might be reached

by a decree of that court and applied to the satisfaction of the judgment against the defendant. See also *McElwane* v. *Willes,* (9 *Wend.* 560,) where Justice Nelson, in the court for the correction of errors, seems to assume that the judgment creditor has a right to claim the interposition of the equitable powers of the court of chancery to aid him in the collection of his debt only out of assets of the defendant *not liable to execution.* Also *Le Roy* v. *Rogers,* (3 *Paige,* 234.) In that case it was held that the plaintiff in a creditor's bill was entitled to a discovery of all the property, both real and personal, which the defendant owned, whether in this state or elsewhere. And the chancellor states, as a reason why the plaintiff should have such discovery, that if the property should be in this state, it might afterwards be reached *by an execution out of that court,* and if elsewhere, the defendant might be compelled to transfer it, by a proper conveyance to a receiver, to be sold and applied to the payment of the plaintiff's debt. This is upon the ground, as stated by Mr. Hoffman in his excellent book upon chancery practice, that the defendant's right to lands in another state or country must necessarily be of an equitable character, even where the title would be clearly legal, if they were situated in this state. (2 *Hoff. Ch. Pr.* 115.) Upon the subject now under examination that author further remarks, that " if the real estate is within this state and of *a legal nature so that a judgment at law binds it,* and an execution can be issued, *this court will reach it by authorizing an execution to be issued from the court of law.* And, as to real estate vested in the defendant at the date both of the judgment and decree, a decree being obtained for the payment of the amount, it is within the *power of the court* to *issue an execution* and have the property sold. (2 *R. S.* 183, § 110.) " This sale," adds Mr. Hoffman, " must, I suppose, be *subject to all previous judgments.*" But why sell the property upon an execution to be issued upon the decree ? Obviously for the reason that, while the legislature have authorized the court to decree satisfaction of the judgment by a sale of personal property, it has not authorized the same thing to be done in respect to real estate.

The Chautauque County Bank v. White.

But it is said that by the assignment executed by Saxton, on the 5th of January, 1839, the legal title to his real estate was vested in the receiver, and it is insisted that, though the court might not have power to decree satisfaction of the Webb and Douglass judgment by a sale of Saxton's real estate, it had the right, having acquired the title by a voluntary conveyance from Saxton to the receiver, to direct the receiver to sell the property so conveyed to him and apply the proceeds to the payment of the creditors having liens upon it. This view seems to be entertained by Justice Gridley in the opinion to which I have before referred. He says, " where the judgment debtor has assigned to a receiver *his real* as well as personal estate, for the benefit of his prosecuting creditor, and the court has removed the fraudulent deed that covered it, *and when all the parties who have acquired any lien upon it are before the court,*" he could see no objection to a sale by the receiver, and a distribution of the proceeds among the creditors according to the priority of their liens. In that case, all the parties interested in the lands had consented to a sale by the receiver, and the question before the court related merely to the priority of their liens. But I am not disposed to dissent from the views thus expressed by Justice Gridley, and will therefore proceed to examine the effect of the assignment of the 5th of January, 1839.

By the decree of the first of November, 1838, which was the only order or decree made against Saxton in the Webb & Douglass suit, the assignment which had been executed to Crosby and Crane, was declared void, and a receiver was directed to be appointed, who was to possess *the usual powers and authority*. And when such receiver, with such powers and authority, should be appointed, Saxton was required to " *assign, transfer and deliver over* on oath to such receiver, all the money, equitable interests, property, things in action, rents, real estate and effects, *which were in his possession, custody or control,* at the time of the service of the injunction. Was it the intention of the court, I ask, in view of what we have seen of the power conferred upon it, and its uniform course and practice in such cases, to clothe the receiver to be appointed with *power*

*and authority* to *invest himself* with the *legal title* to the real estate of Saxton ?   Did it intend that Saxton, in obeying the order, should *divest himself* of such legal title ?   I think not. The court intended, so far as the real estate was concerned, that the receiver should be invested with the necessary power and authority to secure, pending the litigation, the rents and profits.   Saxton and his assignees, who were decreed to have no title, were alike required to *assign, transfer,* and deliver over to the receiver, not the real estate, of which Saxton was the owner, or the legal title to which was vested in him or them, but the real estate in their possession or control.   The decree evidently looked to the execution of an instrument which should have the effect to put the receiver in possession of the property, and nothing farther.   Hence it is, that though the decree is final, no provision whatever is found in it for any sale or other disposition of the real estate.   In obedience to this decree, the assignment of the 5th of January, 1839, was executed.   It purports to have been made in pursuance of the decree and in consideration thereof.   In its terms, it follows the language of the decree, and then declares that the receiver is to hold the property thus assigned to him, *"according to the said decree or order and the laws of this state."*   I admit that the words of the instrument are sufficient to operate as a conveyance, if it was so intended.   But it is the duty of courts, in the construction of every instrument conveying an estate, to carry into effect the intent of the parties.   Though the word " assign" and " transfer," may either of them have the effect to convey, when so intended, yet neither necessarily implies such intention.   (4 *Kent's Com. 5th. ed.* 491, *note a.*)   My conclusion, therefore, is that the assignment executed by Saxton to the receiver did not so effectually divest him of his title to the real estate in question, as to prevent the plaintiff's judgment recovered after the execution of such assignment from becoming a lien thereon.   If I am right in this conclusion, it follows that the plaintiffs, by the sale under their judgment, acquired a legal title to the property, notwithstanding the receiver's sale under which the defendant claims to hold it.

The Chautauque County Bank *v.* White.

But if I am wrong in this conclusion, there is still another ground upon which I think the defendant's claim to the property as against the plaintiffs, must fail. It is the principle which will not allow a man, who, being himself the owner of property, stands by and sees another sell it as his own, without objection, afterwards to assert his title. His silence, when in good conscience he ought to speak, shall close his mouth when he would speak. So, here, the defendant represented at the sale, or if he did not, he induced the receiver to represent, that the property was incumbered greatly beyond its utmost value, and that he who purchased would acquire only the right to the use of the property until a legal title could be perfected under the incumbrances. All who attended the sale, including, I must suppose, the defendant himself, believed these repesentations to be true. All acted upon their truth. The result was, that the defendant purchased the property at a merely nominal price. There were *those interested* in the estate, present, but not a bid was made against the defendant. The sale was, in fact, what the defendant in his letter to the receiver had represented it would be, *a mere form.* The defendant can not now complain, if he is held concluded by the representations then made, at his own instance, and which deterred others from bidding, and enabled him, at a single bid, for an insignificant price, to sweep off the entire estate of Saxton, which ought to have been applied to the satisfaction of his honest debts. Whether the defendant believed the statements made at the sale, or not, can not vary the legal, though it may the moral character of the transaction. If he then believed that all the judgments against Saxton were liens upon the property, and purchased under that belief, he ought to be willing now to occupy the same position upon which he then chose to stand. If he did not believe it, then he deliberately practiced a gross imposition, both upon the receiver himself and all who were interested in the sale. In that case, every principle of common justice would forbid the court to allow him to reap the fruits of such an imposition. In either view of the question, the defendant has already obtained all the benefit from his purchase which he can justly claim, and

must be held to be estopped from denying that the judgments, a schedule of which was exhibited at the sale, were then existing liens upon the property purchased by him. (*Dezell* v. *Odell*, 3 *Hill*, 221.)

I think, too, that the plaintiffs had a right to ask a court of equity to remove the cloud upon their title which the receiver's conveyance to the defendant had created. Whether a bill in equity can be maintained to avoid an instrument, to which there is, appearing upon its face, a valid legal objection, on the ground that, though void, it tends to cast a cloud over the plaintiff's title, is a question by no means well settled. Chancellor Kent, in *Hamilton* v. *Cummins*, (1 *John. Ch.* 517,) holds the affirmative of this question. He says, the weight of authority and the reason of the thing are equally in favor of the jurisdiction, whether the instrument is, or is not, void at law, and whether it is void for matter appearing upon its face, or from extrinsic proof. Justice Story maintains the same position. "Whatever may have been the doubts or difficulties formerly entertained upon this subject," says he, "they seem by the modern decisions to be fairly put at rest, and the jurisdiction is now maintained in the fullest extent." (2 *Story's Equity Juris.* § 700.) Chief Justice Nelson, in delivering the opinion of the court for the correction of errors, in *The Mayor, &c. of Brooklyn* v. *Messerole*, (26 *Wend.* 132,) seems also to concede the jurisdiction of the court in such cases. On the other hand, Chancellor Walworth, in *Van Doren* v. *The Mayor, of New York*, (9 *Paige*, 388,) asserts that, where a valid legal objection appears upon the face of the proceedings through which the adverse party can alone claim any right to the complainant's land, it is not in law such a cloud upon the complainant's title as will authorize a court of equity to interfere. In *Piersoll* v. *Elliot*, (6 *Peters*, 95,) Chief Justice Marshall, referring to this question, says: "The court forbears to analyze and compare the various decisions which have been made on this subject in England, because, after considering them, much contrariety of opinion still prevails on the question of general jurisdiction where the instrument is void at law on its face. The inclination of my

own mind is, I admit, against entertaining jurisdiction in such a case, but *non mihi tentas componere lites.*

However the question may be determined, all the authorities agree in conferring jurisdiction where the claim, whose shade is cast upon the plaintiff's title, is not utterly void upon the face of the instrument itself, but is shown to be so by extrinsic evidence, or where it is shown to be against good conscience to allow the party to set up his claim against the plaintiff's title. " Such jurisdiction," says Story, " is founded on the true principles of equity jurisprudence, which is not merely remedial, but is also preventive of injustice." (*See cases above cited ; also Pettit* v. *Shepherd; 5 Paige,* 493.) Unless, therefore, I have wholly mistaken the principles upon which this case depends, the plaintiffs had a right to appeal to a court of equity for relief against the inequitable claim of the defendant, and have established their right to such relief.

My opinion is, that the decree appealed from should be reversed, and a decree should be entered, declaring that the plaintiffs' judgment, at the time of the receiver's sale, was a lien upon the lands purchased by the defendant at such sale; that, by the sale on the 18th of July, 1840, under the plaintiffs' judgment and the sheriff's deed executed in pursuance of such sale, the plaintiffs acquired a title to the lands so sold, superior to the defendant's title derived from the receiver. The decree should direct that the defendant and his tenants, and any other person claiming under him, surrender to the plaintiffs the possession of the lands purchased by them at the sheriff's sale, except the lot conveyed to the defendant by William H. Seward and wife, on the 12th of January, 1842; that the defendant should be charged with the rents and profits of the property, since, by virtue of their sheriff's deed, the plaintiffs became entitled to the possession of it, and credited with the value of any permanent improvements made by him upon the property; and also the amount paid by him on account of any incumbrances upon the property prior to the plaintiffs' judgment; that it be referred to some suitable person to take an account upon these principles, and that the defendant pay to the plaintiffs any amount which may be

found due upon such accounting.    The defendant must also be charged with the costs of this litigation.          •

WATSON, J. concurred.

PARKER, J. dissented.

Decree accordingly.

