Chief Justice Simpson
delivered the opinion of the Court.
In May, 1821, John T. Mason executed a deed of mortgage to Thomas E. Boswell, conveying to him a tract of land in the county of Bath, lying on Beaver creek, containing one thousand acres, on which a furnace had been erected, being a tract of land patented in the name of the heirs of Thomas Swearingen, dec’d., to secure the payment to the mortgagee, of a debt of upwards of ten thousand dollars due to him, by the mortgagor and James, aud Richard M. Johnson.
On the 5th of June 1823, Mason executed another mortgage to the President, Directors, and Company of of the Bank of Kentucky, on the same tract of land, and on several other parcels of land without any specific description, but referring merely to the several deeds and title papers of the mortgagor in general terms, to secure a debt to the Bank, of seven thousand two hundred and twenty-five dollars. And in May, 1824, he executed to the same parties another mortgage on various other tracts of land in the county of Bath, to secure the payment of a debt of five thousand six hundred and ninety-four dollars that he owed to the Bank, and for which, William T. Barry, Thomas Fletcher, and others, were bound as his sureties.
A suit was instituted in 1827, to foreclose the. mortgage to Boswell, and to have the one thousand acres of land sold for the purpose of paying the debt mentioned in the mortgage; and in the year 1831, under a decree rendered in the, suit, the land was sold and purchased *489 by William Johnson, to whom it was conveyed by a commissioner appointed by the Court, and it was after-wards conveyed by the purchaser to the President and Directors of the Bank of Kentucky.
The President, Directors, áre., of the Bank of Kentucky brought a suit in chancery in the Franklin Circuit Court for the purpose of procuring a sale of the lands included in the mortgage, executed to them by Mason, in 1824. The suit was instituted in 1827, and a decree to sell the mortgaged property was rendered in 1829, but no sale has ever been made. In April, 1837, the same parties instituted a suit in the Bath Circuit Court to foreclose the same mortgage, but no decree was ever rendered in the suit, and in 1844 an order was made directing the papers to be filed away, and no steps have since that time been taken in ti}e cause, by any pf the parties. It does not appear that any proceedings have ever been had upon the mortgage executed tp th,e Bank in 1823.
On the 23d day of August, 1836, the Bank of Kentucky, by her agent H. Blanton, executed to the heirs of Robert Scobee, dec’d., a deed conveying to them “-certain pieces or parcels of land situate lying and being in the county of Bath, which was conveyed to the parties of the first part by John T. Mason and others, lying on Beaver creek and its waters, and known as a part of the land attached to the Beaver iron-works, and conveyed as aforesaid, except two tracts at the mouth of Beaver creek, one in the name of Lee, and the other in the name ®f Smith, which is excepted in this sale.”
Robert WicklifFe, in the year 1827, attained a judgment by confession, against John T. Mason in the Jessamine Circuit Court for the sum of four thousand five hundred and seventeen dollars and seventy cents, and in the year 1839, he had an execution issued on the judgment and directed to the sheriff of Bath county, which execution was levied by the sheriff on twenty-seven tracts of land in the county of Bath, being the *490 same land contained in the mortgage of 1824 executed by Mason to the Bank of Kentucky, and Mason’s equity of redemption therein was sold, and purchased by •the plaintiff in the execution, at the price of about seven hundred and thirty-three dollars. Wickliffe subsequently had another execution on the same judgment issued to the county of Bath, which was levied by the sheriff of that county on thirty-four tracts of land, all of which were sold by him as the property of Mason, and purchased by Wicklifie at the price of one hundred and fifty-five dollars, for all of which lands he obtained a conveyance from the sheriff. The lands sold under the latter execution, were the same lands in which .Mason’s equity of redemption had been previously sold '.under the first execution, together with several additional tracts of land not embraced in that sale. But neither sale included the tract of one thousand acres on Beaver creek on which a furnace had been erected, and which had been sold under the mortgage to Boswell, and purchased by William Johnson and conveyed by him to the Bank of Kentucky.
This suit in chancery was instituted by Robert Wick-lifie in the year 1841, against the President, Directors, •and company of the Bank of Kentucky, Harrison Blan-ton as their agent, John T. Mason, the heirs of Robert Scobee, dec’d., and James Armitage, who claimed under Scobee’s heirs. In his original bill he claimed the land contained in the deed made to him by the sheriff of Bath county, under his two purchases, and alleged that the second sale and purchase was made in consequence of information obtained by him after -the sale of the equity of redemption, that the President, Directors-and.company of the Bank of Kentucky had sometime previously by H. Blanton, their authorized agent, •executed to John T. Mason a release of the debts secured by the mortgages executed by him to them, whereby the land was discharged from the incumbrance of the mortgages, and was liable to execution. He alleged that Scobee’s heirs, and Armitage claiming un» *491 tier them, had obtained possession of part of the land purchased by him, and wei'e claiming it and also other portions of the land that he had purchased, and prayed that the defendants .might be compelled to release to him any title they had to said lands, and that his right and > title thereto might be made perfect and quieted.
By an amended bill he alleged the execution of the release to Mason, and set up and relied upon it. lid also alleged that Scobee had in his lifetime purchased from the agent of the Bank five hundred acres and no-more, of the land upon which the furnace was located, and that his heirs after his death had by fraud, procured' the execution of the deed to them, for more land than' had been pu-rchased by their ancestor.' He admitted-Christie Scobee, one of the heirs, had-by deeds'of con* veyance from the other heirs, obtained the-title to the land conveyed to the heirs by Blanton as agent for the Bank, as stated by Christie Scobee in his answer, and" agreed that such should be regarded as the true state of fact in the preparation and trial of the suit. And it-was subsequently agreed upon the record by the parties that Christie Scobee was invested with-the title to alb the land in contest, which his ancestor Robert'Scobee-had at the time of his death.
Mason answered, and set up and relied upon the- release executed to him by Blanton as agent'for the Bank,. which release was executed in June 1837. Christie-Scobee in his answers to the original and amended bill, denied the alleged fraud in obtaining the deed from the agent oí the Bank, controverted the complainant’s right' to any of the lands, and stated that he knew nothing of the release set up, or the manner of its procurement,, but that its date was subsequent to the execution of the deed to Scobee’s heirs, and that therefore the Bank had' parted with all her interest in the lands in controversy, and had nothing to release at the time the deed of- release was executed. Harrison Blanton answered as the agent of the Bank of Kentucky, and' alleged that the release to Mason was intended, and so understood* *492 by the parties, to be, merely a personal discharge from all liability for the debts, after the mortgaged property was exhausted, which was to be retained by the Bank as its own, and that such was the legal effect of the writing denominated a release. But he did not allege either fraud or mistake in its execution.
The release referred to is in the following language, viz:
“ Know all men by these presents, that I, Harrison Blanton, agent for the President, Directors, and company of the Bank of Kentucky, hath for and in consideration of the sum of seven hundred dollars, the receipt whereof is hereby acknowledged, covenanted and agreed, and do by these presents covenant and agree to, and with John T. Mason, that they will hereby give up and surrender all claim and demand against the said Mason and all others, upon the following notes, &c.,” áiiumerátirig and describing the debts and the balances düfe thefeon, contained in the two mortgages to the feank.
In 1846; after the defendants had answered, Wick-liffe filed another amended bill, in which he alleged that Scobee ánd those clairfiifig under him; hád never been in thbactudl pbssessib'ri of any part of the land, except five hundred acres afbtmd the furnace; and that he wds hiiiiself id the p'bssession of the balánee of the lands; btii ás the defendants pretended to háve a claim upon it; they thereby disparaged his title and obstructed him in the full enjoyment of his property. He also alleged that the defendants all knew the signature of Blanton, and the seal of the corporation, and he therefore called on them and each of them, to deny or ad-tnit that the release to Mason was the act and deed of the Bank by their agent, the defendant Blanton. This amended bill was not answered by either of the defendants.
It appears from the testimony, that Scobee purchased from the agent of the Bank, the land around the furnace in the Swearingen surkey, for the sum of five *493 hundred dollars. That the agent who made the sale, executed a bond to Scobee, at which timp it was suggested by the latter, that he wished to keep stock in the range on Beaver, and for the purpose of preventing other persons from using that range, he would like the bond to be drawn in general terms, which the agent proved was done for that and no other purpose, as Sco-bee had purchased no land, but the land owned by the' Bank in the Swearingen claim, supposed by the agent,' as he deposed, to have been five hundred acres only.The sale to Scobee was made by Sudduth, who was the agent of the Bank at that time, and the deed was executed by Blanton, as he proved, in pursuance of the bond previously executed by Sudduth. Blanton also testified that when he executed the release to Mason, he had no intention that it should operate as' a i’elease of the property mortgaged, and lie then believed that the Bank had a full and clear title to all the lands.
The decree of the Giicnii' Court.
The Coui*t below rendered a decree cancelling the deed to Scobee, for any land, except the Swearingen survey of one thousand acres around the furnace, and enjoining the defendants from further disturbing Wic'k-liffe’s possession and title to the lands in contest outside of the Swearingen claim. To that decree Armi-tage has prosecuted a writ of error.
The first objection made to the decree is, that the proper parties were not before the Court. No process Was served upon the President and Directors of the Bank of Kentucky, nor was process served upon all the heirs of Robert Scobee, dec’d. On the other side, it is contended that this objection is not available, because as to the Bank, Blanton who appeared and answered, was, by an act of the Legislature, invested with all the powers that had previously belonged to the President and Directors, and had complete control over all its business; and the agreement of the parties that Christie Scobee, was invested with all the title that his ancestor had, dispensed with the necessity of making the other heirs parties. Whether these reasons are or *494 not sufficient to obviate the necessity of having had the process executed upon all the defendants ; we do not deem it necessary to determine, inasmuch as this objection is ¡not embraced by either of the assignments of error.
One holding the legal title and being in possession may maintain a suit in chancery to quiet his possess ion under the statute of 1756: (1 Statute Law 254,1 or upon general principles ol equity.
Wickliffe exhibited patents for the various tracts of land conveyed to him by the sheriff, but failed, as to some of the tracts, to adduce a regular derivation of title from the patentees to John T. Mason ; it is consequently contended that the complainant should have made the holders of the legal title parties to his suit. But as he sought no relief against them, it was unnecessary ¡to make them parties. lie could only maintain his bill, for the purpose of establishing his claim, and quieting his title and possession, to that part of the land to which he had the legal title, and of which he was actually possessed. The decree does not affect the interest or right of those who were not parties to the suit, and the want of proper or necessarf parties, as before remarked, is an objection not made by any of the assignments of error. And as all the parties to this controversy except Mason himself, claims under him, he must be regarded so far as they are concerned, as having been invested with the legal title originally, and the rights of the parties depend upon the title which they have respectively derived from him.
Another objection made to the decree is, that the complainant did not present a case of which a Court of chancery had jurisdiction. If by his purchases under execution at the shei'iff’s sales, he acquired nothing but an equity of redemption, he might have applied to a Court of chancery to redeem the mortgaged property ; but his original and amended bills were not formed for that purpose, nor do they contain an offer to redeem, nor even a proposition that so much of the property, as is necessary, should be sold to pay the mortgage debts. On the contrary he claims the land as his own absolutely, and the aim and object of the suit was to quiet his title. If he had the possession, and the *495 legal title, he had a right to institute his suit against any other person setting up a claim to it or any part of it. The statute of 1796: (1 Vol. Stat. Law 294,) expressly authorizes a suit to be brought in such a case, and we have no doubt, of the right of a person under such circumstances, to maintain a suit in a Court of chancery independently of the statute, upon well established equitable principles. But in the manner in which the suit was brought and conducted, unless the complainant had a right to file a bill of quia timet, he has not presented such a case, as authorized a Court of equity to afford him any relief.
An exhibit set out in an amended. bill, ' and stated to be known to the defendants to be genuine, and which is not answered will be regarded, at the hearing as genuine.
The enquiry then arises, did Wickliffe make it appear .that he was invested with the possession of, and the legal title to, the land’s claimed by him. As he alleged in his last amended bill, that he was in the possession of the lands, and it was not denied, the amended bill not having been answered, the fact must be taken to he, as therein alleged by him. But the question of title, is more important, and must in the next place be considered.
The release executed to Mason, is relied upon, as having reinvested him with the legal title to the lands mortgaged, and consequently as having through the medium of the sheriff’s sale and conveyance vested it in Wickliffe as purchaser. The reading of the release upon the trial was objected to upon the ground, that its execution had not been proved, but the objection was overruled, and the release read'as evidence. The correctness of this decision of the Court is evident, inasmuch as it was averred in the amended bill heretofore referred to, that the defendants all knew the signature of Blanton, the agent of the bank, and the seal of the corporation, and they were called upon to admit or deny that the release was the act and deed of the Bank by Blanton, its agent. Not having denied it, the Court properly regarded the release as the act of the Bank, and permitted it to be used as evidence against the defendants. Besides, the conveyance to *496 Scobee was made by Blanton, and he was recognized by both parties as the agent of the Bank, and the execution of the release was not denied by him, but on the contrary was admitted in his answer, and substantially proved in his deposition, taken by the defendants, and read as evidence upon the trial.
A release to mortgagor o: property -mort; gaged, from all farther Habilip or for the debts which the mort gage was intend ed to secare i: a release of thi' mortgaged prop i©rty.
As the release discharged Mason from all further liability for the debts and demands therein specified, its legal effect and operation was to discharge his property also, from all liability for their payment, and as none of the lands had been sold under the mortgages to the Bank, and the proceeds applied to the satisfaction of the debts, no right to sell Mason’s property for the payment of debts for which he was not liable, existed after the execution of the release. No fraud or mistake is alleged to have occurred in the execution of the release, which is broad and comprehensive in its import, and contains no reservation of the mortgaged property, or of any other right or claim upon the part of the Bank. The intention or .understanding of the agent when he executed it, cannot limit its legal operation. What the agreement of the parties was, do.es not appear; and therefore it cannot be decided, that the release is not in strict conformity with such agreement. But it only discharged Mason from the balance of the debts and demands then due. So far as the debts had been paid either in lands or in any other manner, the Bank had a right to retain what it had received. The only land however that had been conveyed to the Bank in payment of the debts or any part of them, was the survey of .one thousand acres in the name of Swearingen, contained in the deed executed by William Johnson. That tract of land was deeded to the Bank as part of the consideration upon which the sureties of Mason, in the debts named in the mortgage of 1823, were to be discharged from further liability for said debts. The other lands were only held in mortgage to secure the payment of the debts, and when the mortgagor was released from them, the Bank had no *497 further claim under the mortgages. The fact that a decree for the sale of the lands had been obtained under the mortgage of 1824, did not change the rights of the parties. The object of the sale was to pay the debts due by the mortgagor, and when he was released from them the Bank had no right to sell, but the d.ecree become inoperative, and any attempt to execute it would have been inequitable and unjust.
If laud be mortgaged to secure a debt, and the debt be paid, the legal title revests in the mortgagor, (t Mar. 53, 7 J. J. Mar. 257.) l)y analogy the teleased of the debt should have the same legal effect: (See Hawkins’ heirs vs. King, 2 Mar. 109.) Such will be the effect lliough there had been a decree for sale to satisfy the mortgage debt.
Did however, the execution of the release, operate in law to transfer the legal title, to the land’s, to the mortgagor. Upon the solution of this question, the extent of the right acquired by the complainant, as purchaser, at the second sale made by the sheriff, essentially defends. If the legal title were in Mason at the time of the levy and sale made by the sheriff, it passed to the purchaser by the sheriff’s deed. If it were not, the sale was nugatory and unavialing, an$ no right or title under it, passed to the purchaser.
The doctrine is well settled, that upon the payment of the money secured by the mortgage, the legal title to the land is by operation of law, immediately reinvested in the mortgagor: (1 Mar., Rep., 53.) Dougherty vs Kerchival, (1 J. J. Mar., 257,) Breckinridge heirs vs Ormsby.
By analogy, a release of the debt, should have the same legal effect. The extinguishment of the debfs whether it be by payment or release, deprives the mortgagee of all right to the property mortgaged, and there seems to be no good reason why the legal title, should not be transferred by operation of law to the mortgagor in one case as well as in the other. Such appears to have been the opinion of this Court, in the case of Hawkin's heirs vs King: (2 Mar., 109,) where it is said, that “the assignment of the debt, or forgiving it, will draw the land after it as a conveyance; nay it will do it, though the debt were forgiven by parol, for the right to the land would follow, notwithstanding the statute of frauds.”
A deed convoying more land by its terms than the grantor had a right to convey, might bs effectual only to convey so much as he might lawfully convey.
As no change in the rights of the parties was effected by the decree which had been obtained by the bank, to sell the land included in the mortgage executed in 1824, but the land still continued to be merely a security for the payment of the debt, the release of the debt, had the same legal effeet and operation upon the title, that it would have had, if no decree for the sale of the property had been rendered.
It follows then from these principles, that the legal title to the lands embraced in the deeds of mortgage to the bank, was in Mason, at the time of the sheriffs sale, and passed to the purchaser, unless they had been conveyed by the bank to Robert Scobee, before the release to Mason was executed; and that conveyance, had the effect to prevent the transfer of the legal title to Mason.
The deed to Scobee, was executed before the release, and it becomes therefore, necessary to determine what land it embraced, and what title passed to the grantee. The only land owned by the bank, which had been included in any of the deeds of mortgage, was the Swearingen tract of one thousand acres. That, or part of it, was the land sold to Scobee, and was the only land that the bank had the power to sell absolutely. The description of the land conveyed to Scobee, contained in the deed, is indefinite and uncertain. But it is evident from the contents of the deed, and from the testimony upon the subject, that the land sold and intended to be conveyed by the bank to Scobee, was the land that belonged to the bank, and not the land to which the bank had no title, except, that, conferred by the deeds of mortgage. If the deed to Scobee includes any of the land, which the bank did not own at the time, of its execution, but held merely as a security under the deeds of mortgage, it was manifestly included in the deed by mistake, as it is not pretended, that ■ the bank designed to transfer to Scobee, any part of the debt on Mason, and the only effect, that could be given to a conveyance by the mortgagee, of the land *499 contained in the mortgage, would be to invest his alienee, with the same right which he had to it, and for that purpose it might be regarded, where such was the intention of the parties, as transferring the debt, at least in equity, as well as the security, to the alienee. But here the debt on Mason, was not transferred or intended to be transferred to Scobee, by the bank, and if the deed embraced any of the land held by the bank in mortgage as a mere security, it was included either by mistake, or in consequence of the manner in which the contract had been drawn, by the agent of the bank at the instance of the purchaser, and by the concealment of that fact at the time the deed was executed, in either case the title to the land, was held by the alienee in trust for the bank, and when the debt was released the title became reinvested in Mason, in the same manner as it would have done, if it had continued in the mortgagees. So that it is not material whether the deed to Scobee, included any of the land which thebank held merely in mortgage or not, as the same legal effect was produced by the execution of the release, whether the title still continued in the bank, or had been conveyed to Scobee.
Apperson, French, and Peters, for plaintiff; Wick-liff'e for defendant.
It results from'these views and principles that the decree of the Circuit Court confirming Wickliffe’s title to all the land, except the Swearingen claim, to which ho does not appear to have any right, is correct.
Wherefore, the decree is affirmed.