## HARDY VS. HEARD ET AL.

The design of the statute, in requiring the recital of the judgment, execution, &c., in a deed by a sheriff for land sold under execution, was to relieve the purchaser from the necessity of producing the judgment, &c., and to leave to the party, who would contest the sale, to establish its invalidity.

A deed for land sold under execution, not containing the recitals mentioned in the statute, or not showing on its face a compliance with the law, could not be evidence under the statute. But if such deed is in compliance with the statute, it is only prima facie evidence, and may be entirely overthrown by evidence that the sale had never been made, or had not been made in accordance with law.

A vendee of real estate, holding under a bond for title, has such an interest in the land as is subject to a judgment lien and to sale under execution; subject to the legal and equitable rights of the vendor for the unpaid purchase money.

Mere inadequacy of price, without additional circumstances, is not sufficient to invalidate a sale under execution, when fairly and legally made.

The rule in chancery is, that the admission of incompetent evidence will not vitiate, if there is sufficient competent proof to sustain the decree. 4 *Eng.* 546.

It is a universal rule, that he who submits to answer, must answer fully and fairly all the material allegations and charges of the bill; and has no right to answer that he is not willing to admit any particular fact; nor take shelter behind sweeping and broad denials and vague generalities.

Where a defendant fails to answer a statement in the bill, which is neither charged nor presumed to be within his knowledge, such failure is not an implied admission of its truth, (*Blakeney vs. Ferguson*, 14 *Ark.*); otherwise, where it is charged or presumed to be within the defendant's knowledge, or where it is answered evasively.

A. sells and conveys a tract of land to B., reserving, in the deed, all pieces or parcels of land granted, bargained and sold to sundry persons in the town of Arkadelphia, in one and two acre lots: HELD, That the reservation in the deed was sufficient to put B. upon enquiry, and affect him with notice as to the persons to whom the lots had been previously sold; and as to the extent, situation and locality of the lots: and that a forfeiture of the lots previously sold, could not enure to the benefit of B.

In the absence of all evidence to the contrary, courts are bound to presume that any purchaser of real estate, informs himself of its boundaries, situation and locality, before making the purchase.

*Appeal from Clark Circuit Court in Chancery.*

The Hon. JOHN QUILLIN, Circuit Judge.

CURRAN, for the appellant.

FLANAGIN, for the appellees.

Hon. S. H. HEMPSTEAD, Special Judge delivered the opinion of the Court.

In 1846, James K. Rogers, owner in fee, of the west-half of the north-east quarter of section twenty, in township seven south, of range nineteen west, containing eighty acres of land, situated in Clark county, sold one acre of it, in the town of Arkadelphia, described by certain lines, to Robert Montgomery, for one hundred and fifty dollars, who paid a part of the consideration money, took actual possession, and erected, at a cost of one hundred dollars, a dwelling house and blacksmith shop on the lot, and enclosed a garden. Montgomery took a bond for title, which was not produced; but the scope and purport of it appears to have been that Montgomery was to pay one hundred dollars to Rogers, in two years in annual instalments, and then receive a title; and if not punctually paid the lot to revert, and improvements to be forfeited. On the the 15th of January, 1848, Rogers and wife, among other lands, conveyed by deed of bargain and sale with general warranty, to Henry K. Hardy, the appellant, the above described tract of land; but expressly reserving "all pieces and parcels of land granted, bargained and sold to sundry persons, in the town of Arkadelphia, in one and two acre lots," leaving one hundred and thirty seven acres as the quantity conveyed to Hardy.

Thomas A. Heard and Thomas B. Sloan obtained judgment against Montgomery, on the 25th of March, 1848, before a justice of the peace, for seventy-three dollars and ninety-one cents, and execution thereon being returned "nulla bona," a transcript was taken and filed in the office of the clerk of the Circuit Court of Clark county, where the lot was situated, on the 10th of July, 1848, in accordance with the statute. (*Digest* 661; *State use of Brown vs. Crow et al.*, 6 *Eng.* 652.) Execution issued out of that office, on the 1st of December, 1848, by virtue whereof the same

24BB

lot was levied on as the property of Montgomery; and which was advertised, and sold, at the succeeding court, in due form of law, to Heard and Sloan, the appellees, as the last and best bidders, and as the purchasers at the sum of ten dollars; and, who having paid the bid, the sheriff, on the 24th of September, 1849, made and acknowledged a deed to them in due form, and which was immediately recorded. About this time, they paid to Rogers the balance of the purchase money on the lot, and Rogers and wife made them a quit claim deed, embracing the one acre lot sold to Montgomery, dated the 29th of March, 1849; but which was neither acknowledged nor recorded, and which was certainly defective as a legal conveyance, and fell far short of the title Rogers was bound to make, on payment of the purchase money.

Heard and Sloan filed their bill to obtain title to the one acre lot, purchased by them at execution sale, and for general relief, and they made James K. Rogers, Henry K. Hardy and Robert Montgomery defendants to their bill. The Court, at the hearing, decreed "that all the right, title, interest and claim of the defendants to said lot vest absolutely in the complainants, and that the said complainants have an absolute title in fee simple, and discharged from any and all claim of the defendants." From this decree, Hardy appealed.

The first inquiry is, whether Heard and Sloan had such title to the lot as to authorize them to apply to a court of equity for relief, and of this we think there can be no doubt; nor do we apprehend any question can be made as to the jurisdiction of a court of equity to grant the relief sought. The deed of the officer to them, recited the names of the parties to the execution, and when issued, and the date and amount of the judgment, the return of "nulla bona" on the execution issued by the justice, the filing of the transcript, and other particulars as to the execution and sale; and which recitals are by express statute made evidence of the facts therein stated. (*Digest* 504.) The manifest design of this statute was to relieve the purchaser from the necessity of producing a judgment and execution, levy and advertisement; or, in

other words, to excuse him from the duty of proving, in the first instance, that the law had been complied with; and leaving it to the party, who would contest the sale, to establish its invalidity. The statute rests on the fundamental principle that public officers, executive, judicial and ministerial, are presumed to discharge their duties, until the contrary is made to appear; and on the further ground that there is no better method of encouraging fair judicial sales, and protecting *bona fide* purchasers, than to afford all reasonable facilities to enable them to reap the fruits of their purchases. A deed, not containing the recitals mentioned in the statute, or not showing on its face a compliance with the law, could not be evidence under the statute. (*Moore vs. Brown*, 11 *How. S. C. R.* 424.) Nor is a deed in compliance with the statute, any thing more than *prima facie* evidence, as was held by this Court in *Newton vs. The State Bank*, (14 *Ark.* 10); and may, therefore, be entirely overthrown by evidence; because, unless it was competent to prove that the sale had not been made at all, or that it had not been made in accordance with law, the door would be closed to enquiry; the deed, whether true or false, import absolute verity on its face, and so far from being only *prima facie* evidence would become conclusive evidence of the facts recited. Such a doctrine would place it in the power of an officer to deprive a man of his freehold against law, and with comparative impunity. Montgomery had a bond for title, and consequently had such an interest in the land, as was subject to a judgment lien, and subject to sale under execution. Our statute is very comprehensive, and declares all real estate subject to execution, whereof the defendant, or any person for him is seized "in law or equity," and also the lien of a judgment attaches to all estates and interests in lands and tenements, whether "legal or equitable," liable to be sold under execution. (*Digest* 498, *sec.* 25; 627 *sec.* 36.) The vendee of real estate, holding a bond for title, is in equity considered as the real owner, whether he had paid the purchase money, or actually taken possession or not, subject only to the legal and equitable rights of the vendor for

the unpaid purchase money. As owner, he has an interest; to which the lien of a judgment attaches, and which may be seized and sold under execution. In *Smith et al. vs. Robinson*, (13 *Ark.* 534,) the nature of title bonds was elaborately discussed, and the Court held that the parties to such a contract stood in the relative positions of mortgager and mortgagee, and that all the incidents of a mortgage attached to and controlled these kind of contracts. (5 *Porter* 452.) It follows, then, that the vendee, in analogy to the mortgager, is the owner of an equity of redemption, and that this is the real and beneficial estate, which is descendible by inheritance, devisable by will, and alienable by deed, precisely as if it were an absolute estate of inheritance at law (4 *Kent* 159, 160); subject, of course, to the rights of the vendor. The purchasers, then, succeeded to all the rights of Montgomery, and although the amount bid by them was small, yet it was the highest and best bid, at a public sale, on regular notice, at the time and place appointed by law, and which appears to have been fairly and properly conducted. It has become well settled that mere inadequacy of price, without additional circumstances, is not sufficient to invalidate a sale, fairly and legally made, and the sound reason for the rule is, that the intrinsic value of property cannot be measured by any precise standard; but depends upon opinion, different in different men, and influenced by various circumstances. It must, in its very nature, be fluctuating; high at one time, depressed at another, according to the actual condition of the monetary affairs, and comparative prosperity of the country. (1 *Story's Eq.* 245.) And there are other reasons equally persuasive. Lands offered for sale on execution, may be encumbered with prior liens, to nearly if not quite their value, or subject to adverse claims or pretensions, or there may be defects or suspicions as to the validity of titles; and to expect, under these and like circumstances, that property will sell for what a person, unacquainted with such circumstances, would say it was worth, would be unjust to purchasers, and destroy all confidence in judicial sales. *Livingston vs. Byrne*, 11 *Johns.*

566; *Williamson vs. Dale*, 3 *Johns. Ch. R.* 292; *Osgood vs. Franklin*, 2 *Johns. Ch. R.* 23 to 29.

Lands thus situated, can hardly be said to have any determinate value, beyond what they will produce at a public sale fairly conducted. It resolves itself into this, that the law, having designated the mode, manner, time, and place of sale under execution, has made that the test of value, and to disregard it, on the isolated ground of inadequacy of consideration, would not only be extremely dangerous, but would be to exert a sort of dispensing power, which is happily unknown to a government of laws. A precedent like that, carried out to its fullest extent, would, in the language of Lord Chief Baron Eyre, in *Griffith vs. Spratly*, (1 *Cox. R.* 383,) "throw every thing into confusion, and set afloat the contracts of mankind." It may be stated, then, as a safe and salutary rule of property, that mere inadequacy of consideration, or price, is not sufficient to avoid a sale fairly made.

There is nothing in the title, set up by Heard and Sloan, that renders it unfit or improper for a Court of equity to afford relief, in case they are in other respects entitled to it.

In deciding whether the decree is correct, as to Hardy, the most material point is, as to the identity and locality of the one acre lot sold by Rogers to Montgomery, and for which the latter held a title bond; and this must depend on the bill and answer of Hardy. For, although the deposition of Rogers was taken by the complainants, and read at the hearing against Hardy's objection, it discloses nothing material to that question, even supposing Rogers to be a competent witness, which we do not decide; although inclined to the opinion that he was incompetent. *Jackson vs. Hallenback*, 2 *John.* 394.

But we think the deposition may be excluded, and the decree maintained. The rule in chancery is, that the admission of incompetent evidence will not vitiate, if there is sufficient competent proof to sustain the decree. 4 *Eng.* 546.

The bill alleged that, in 1846, Montgomery purchased from Rogers one acre lot in the town of Arkadelphia, described in the

bill by particular lines, received a title bond, took possession,
built a dwelling-house and blacksmith-shop, and enclosed a
garden on the lot, and resided on it; that, in the purchase made
by Hardy from Rogers, the deed contained an express reservation
of one and two acre lots in Arkadelphia, sold previously to sundry
persons, whose names are not specified in the deed; that Hardy
knew, at the time of his purchase, that Montgomery had bought,
improved, and was then living on, and in the actual possession
of the one acre lot, mentioned in the bill; that the original title
bond was pretended to be lost or destroyed; that Hardy, to de-
fraud the complainants, sets up his pretended title to said lot; and
he was specially interrogated and required to state, whether
Montgomery had not purchased as alleged, whether the lot as
described was not excepted from sale, whether Hardy did not
know, when he purchased, that Montgomery had bought, im-
proved and lived on the premises described; and whether the
bond for title had not been fraudulently destroyed; and, if not,
where was it, and what its stipulations and conditions?

The description of the lot levied on and sold by the sheriff, as
contained in his deed to Heard and Sloan, and made an exhibit
in the case, was the same, substantially, as that alleged in the
bill, and the exhibit was admitted. These allegations were *of a*
nature to require specific answers; and now let us see how they
were met. Hardy admits that Rogers contracted to sell Mont-
gomery one acre of land, "somewhere in the town of Arka-
delphia, but the exact locality of said land this defendant is *not
willing* to admit." He is careful to set out that, by the contract,
if Montgomery failed to make punctual payment, the land and
improvements should revert; but does not show when payment
was to be made. He does not state that he was uninformed as to
the locality of the one acre lot; or that the description of it in the
bill was not correct or substantially correct; or state or hint in
what respects inaccurate; nor does he, any where in his answer,
deny the locality as alleged, and put the complainants to the
proof. He admits that Montgomery erected, "*in the town of*

*Arkadelphia*, in the year 1846, *on some part* of said quarter sec-
tion of land, a log cabin, blacksmith-shop, and fenced in a garden,
but is not *fully informed* as to the *exact* location of the land
claimed by said complainants." He states that, in the spring of
1848, as well as he recollects, he bought the improvements "made
in said town," from Montgomery, for about fifty dollars, "being
the improvements in the said bill mentioned," that Montgomery
gave him possession thereof six or seven months afterwards, and
stated to Hardy that he was unable to comply with his purchase,
and that the same had reverted, or would revert, to Rogers. He
admits that, at the time he purchased from Rogers, the latter
made a reserve of twenty-three acres, which had been sold to
sundry persons in the town of Arkadelphia, but did not specify
to whom, and refused to have the names of the purchasers speci-
fied in the deed to Hardy, for the reason that the property might
revert to Rogers, and might interfere with his rights. If this be
so, it is difficult to account for the statement by Hardy, that
Rogers was to give him the benefit of all the sales to those to
whom titles had not been made. Hardy says he cannot state
*positively* what land was reserved from sale in the deed to him,
and refers to the deed, which he well knew contained only a
general reservation; and so the enquiry was not answered at all.
In one part of his answer, he admits that, in 1846, Rogers con-
tracted to sell Montgomery one acre of land in Arkadelphia; and,
in another part states, that he "does not know what time the said
Montgomery purchased, or *pretended* to purchase, of said defen-
dant, Rogers." He says he cannot state what has become of the
bond or agreement between Rogers and Montgomery; that he recol-
lects seeing it in the spring or summer of 1848; that he cannot state
*fully* its stipulations, but his *impression* and *belief* are, that if
Montgomery should pay Rogers ninety dollars in one and two
years, that he was to have "one acre of land in the town of
Arkadelphia, fronting on the road leading from *this place* to old
*Greenville*," and, on failure to make payment, the acre was to
revert to Rogers, his heirs or assigns. He does not state that he

had no present knowledge of the bond for title, or that he did not know in whose possession or custody it was, or whether it was lost or destroyed, but simply that he "cannot state what has become of it," without giving us a reason why.

This answer, in no one particular, or as a whole, comes up to the universal rule, that he who submits to answer must answer fully and fairly all the material allegations and charges of the bill, (*Story's Eq. Pl.*, 846, 847; 2 *Daniel Ch. Pr.*, 255,) and it can seldom fall to the lot of any court to pass upon an answer more unsatisfactory or evasive; and which should not have been allowed to be placed on the files of the court, as the decree *pro confesso* had to be set aside to let it in. That it is evasive, is self-evident; and, as was said in another case, it evinces a "studied choice of phraseology," and loose generalities, "to escape from any direct answer to the allegations in the bill." (2 *Sumner* 231.) Looking to the circumstances of the case, as developed by the record, and even on the face of the answer, no one, as we think, could come to any other conclusion than that Hardy was familiar with the purchase made by Montgomery from Rogers; the nature of the contract, the locality of the lot, and made his own purchase with a knowledge of these facts; and that he did not deny the description contained in the bill, because he could not conscienciously do it. It may fairly be presumed, that the fact was within his knowledge. Indeed, it could hardly have been otherwise. If this were a case where Hardy stood in the position of a purcha-. ser of the one acre lot, it would be quite impossible for a court of equity to hold him as an innocent purchaser without notice, and allow him to retain the fruits of his purchase, because he would have to be held chargeable with notice of the prior rights of Montgomery, on the principle, now universally admitted, that whatever is sufficient to put a purchaser on enquiry, is considered as conveying notice. (4 *Cow.* 722; 1 *Johns. Ch. R.* 267; 2 *Vesey, Jr.* 440; 3 *Scam.* 202.) This is sometimes called constructive notice, or notice in law, and which is no more than evidence of

notice, the presumption of which is so violent, that it cannot be suffered to be controverted.   4 *Kent* 179; 1 *Story's Eq.* 399.

Where a party has possession or knowledge of a deed, under which he claims his title, and it recites another deed, which shows a title in a third person, the Court will presume him to have notice of the contents of the deed thus referred to, or recited, and will not permit him to introduce evidence to disprove it.   Notice of a lease, is notice of its contents.   (14 *Vesey* 426.)   If a person purchases an estate in possession of tenants, he is bound to enquire into the estate those tenants have, and, therefore, will be affected with notice of all the facts, as to the extent, nature, and duration of their estates.   (2 *Vesey, jr.,* 440; 1 *Story's Eq.* 399.)   If a person is in possession of land, a subsequent purchaser is deemed to have notice of the possessor's rights, whatever they may be.   (2 *Paige* 300; 5 *Johns. Ch. R.* 29; 1 *Merivale* 282; 6 *Wendall* 226; 3 *Paige* 423.)   A person, being about to purchase a lot of land, was informed that another had "some sort of claim to it," and this was held sufficient to put him on enquiry, and constitute constructive notice.   1 *Smedes & Marsh. Ch. R.* 45.

Now, laying aside all other considerations, there were two facts in this case sufficient to put Hardy on enquiry, and charge him with notice: *first*, Montgomery was in actual possession of the lot when Hardy purchased; and, *second*, Rogers made an express exception, in his deed to Hardy, of lots previously sold by him to "sundry persons in the town of Arkadelphia."   If there was no other fact or circumstance in the case calculated to put a prudent man on enquiry, this exception was unquestionably amply sufficient to demand from him an investigation as to the persons to whom lots had been sold, and the extent and situation and locality of those lots, if not already apprised of these facts.   And he must be held cognizant of the locality of the lot sold to Montgomery, because the latter was in the actual possession, because it was a part of the reservation made in the deed, and because for Hardy to ascertain and to inform himself of the lines and

25BB

boundaries of his own land, was to learn the locality of the lot in controversy. *Jones vs. Smith*, 1 *Hare R.* 43.

Certainly, in the absence of all evidence to the contrary, courts are bound to presume that every purchaser of real estate informs himself of its boundaries, situation, and locality, before making the purchase. This is consistent with the ordinary course of human transactions, and the. experience of mankind. The law itself makes that presumption effectual until destroyed by counter proof, and there is nothing in the record tending to weaken, but there are facts and circumstances, amply sufficient to sustain, that presumption in the case now under consideration.

As a defendant in chancery, submitting to answer, must answer fully and fairly, he has no right to say he is not willing to admit any particular fact or facts, and rest his defence there; nor can he take shelter behind sweeping and broad denials, or vague generalities. (3 *B. Mon.* 17, 18.) Such a practice would thwart the end to be attained by courts of equity, which is to arrive at the real justice of the case by appealing to the conscience of the defendant. And this brings us to the question as to the consequences of a failure to answer a fact charged, and presumed to be within the knowledge of the defendant. The general rule, as to answering in chancery, was elaborately discussed by this Court in *Blakeney vs. Ferguson*, decided at January term, 1854. The fact in that case was, that the complainants alleged themselves to be, and claimed as widow and heirs at law of Joseph Ferguson, deceasd. Blakeney, in answering, entirely omitted to notice or answer that statement, and there was no proof of it at the hearing. *It was neither charged, nor could it be presumed, to be within his knowledge.* On this state of case, quite different from the one now involved, the Court very correctly and properly applied the *general* rule, that the failure of Blakeney to answer that statement could not amount to an implied admission of its truth, and that, as the complainants had omitted to prove it, the decree could not be sustained. That rule is well supported by authority, and with it we are entirely satisfied; and think it

should govern in all cases, where the fact is neither charged, nor could be presumed within the knowledge of the defendant.

But, it has now become to be a clear exception to that rule, which we feel disposed to recognize and enforce, that where the bill charges the fact to be within the knowledge of the defendant, and which may fairly be presumed to be so ; or without so charging, the fact may reasonably be said to be within the defendant's knowledge, if the answer is silent as to that fact, or it is answered evasively, it amounts to an *implied admission* of the fact thus stated ; and no further proof is necessary to warrant a decree against the defendant upon it. (*Scotts vs. Hume, Lit. Sel. Cas.* 379; *Lewis vs. Stafford,* 4 *Bibb* 318; *Moore vs. Lockett,* 2 *Bibb* 69; *McCampbell vs. Gill,* 4 *J. J. Marsh.* 90; *Price adm. vs. Boswell,* 3 *B. Mon.* 17, 18; *Mitchell vs. Maupin,* 3 *Mon.* 187; *Bright vs. Wagle,* 3 *Dana* 256; *Armitage vs. Wickliffe,* 12 *B. Mon.* 488; *Neale vs. Haythorp,* 3 *Bland* 551.) Evasion is worse than silence ; because the former may be the result of carelessnes or inattention, while the latter springs from design, and is entitled to no favor whatever.

This exception and qualification of the general rule are only applicable in cases of knowledge, either charged or presumed; and if a fact should be charged to be within the knowledge of the defendant, which in the very nature of things could not be, or it was extremely improbable it should be so, there could of course be no implied admission arising from either silence or evasion. Before the complainant can have the benefit of the implied admission, it must appear reasonable that the fact is within the knowledge of the defendant. The exception, herein adverted to, was noticed and admitted in *Blakeney vs. Ferguson,* to exist in cases " where the omitted or evaded fact, may be *prima facie* within the knowledge of the defendant," and although it was not received with favor, but rather regarded as of "mischievous tendency," yet the exception was not denied, nor the authorities by which it is sustained at all questioned.

A similar principle seems to have been acted on by this Court

in *Pelham vs. Floyd*, 4 *Eng*. 532, and which was a case where
the facts charged were in the knowledge of the defendant, and
not denied. The Court held that where facts are charged and not
denied, but other facts are set up in avoidance, it was not neces-
sary to prove the facts thus charged. And this exception, quali-
fied as it is, does not appear to be unjust, or of dangerous ten-
dency. It rests on the sole foundation, applicable to pleadings,
that the distinct and explicit assertion, by one party, of a mate-
rial fact, reasonably presumed to be within the knowlege of the
other, and affecting his interest, will be controverted if it is not
true; and the party is not concluded unless he has an opportunity
of denying it.

Men act on this principle constantly, in the ordinary affairs of
life ; for it is a rule of evidence that what one party declares to
another, without contradiction, when it naturally calls for con-
tradiction if not true, is admissible evidence. (1 *Greenl. Ev.* 199.)
It is acted on by courts, for the failure of a defendant, duly sum-
moned, to defend an action at law, subjects him to judgment by
default without further proof. His failure to appear, is a tacit
admission of the cause of action and the right of the plaintiff to
recover.

Bills in chancery are constantly taken for confessed, and, pro-
vided the bill is sufficient on its face, a final decree may be made
on that admission without further evidence, and indeed proof
could not be received to militate against that admission. (2
*Bland Ch. R.* 447.) It is not only supported by authority, but
it grows out of a principle respecting admissions of extensive ap-
plication in jurisprudence. And it is not dangerous to defendants,
because, if they answer fully and fairly as to matters within their
knowledge, the question can never arise, and if they do not,
whether it be the result of negligence or design, they would come
with an ill grace to complain of that which sprung into existence
from their own default. It does not infringe or touch that cardi-
nal rule, that where facts within the knowledge of defendants in
chancery are clearly and positively denied, it requires one wit-

ness and strong corroborating circumstance to destroy the effect of the answer as evidence.   4 *Eng.* 550; 1 *Greenl. Ev.* 260.

Undoubtedly an insufficient answer may be excepted to, and a better one obtained; and it is not to be denied that this is the more appropriate practice, and conformable to the ancient equity practice.   But the modern authorities do not permit us to doubt, that the complainant may, if he chooses, file a replication to an insufficient answer; and, if it is a case where the doctrine, as to implied admissions, would apply, have the benefit of that at the hearing.   It may then be safely laid down as a general rule, as in *Blakeney vs. Ferguson*, that if the fact stated in the bill is not answered, and cannot be presumed to be within the knowledge of the defendant, and the complainant, not obtaining a fuller and more sufficient answer on exceptions, replies to the insufficient answer and goes to a hearing, he must rely upon his own proof to establish the fact thus stated, and not answered, because there is no implied admission of it.   But, on the other hand, it is an admitted and established exception, that if the fact charged is presumed to be within the knowledge of the defendant, to evade, or to omit to answer that fact, is an implied admission, and, without further proof, it may be taken as true at the hearing, and a decree be rendered accordingly.

It follows that, as the locality of the one acre lot in controversy, may fairly be presumed to have been within the knowledge of Hardy, evading it in his answer, in the manner indicated, was equivalent to an admission of the locality as alleged in the bill, and was quite sufficient on that point, to support the decree, without further evidence.

Hardy does not show any right to this lot at all.   It is true that he states his belief that the lot, as described and claimed by the complainants, embraced twenty-seven feet on the west side of an acre he was residing on, and had improved, and which was sold by Rogers to one Swink, in 1846 or 1847, and by Swink and Rogers, by deed of warranty to himself.   As all pleadings must be construed most strongly against the pleader, it follows that

this sale may be assumed to have taken place in 1847, the latest period, and consequently after the sale of the lot to Montgomery At all events it is not shown to have been anterior. But waiving that consideration altogether, it is sufficient to dispose of this point to observe that, as this was new matter in avoidance, it was necessary for Hardy to prove it before any benefit could be derived from it, and there is certainly not a particle of evidence to show that twenty-seven feet of his acre were in fact included, as alleged by him, in the lot claimed by the complainants. The plaintiffs by putting in a general replication to his answer, had denied the matters therein alleged, and the legal effect was to put him to the proof. (*Story's Eq. Pl.* 877; 4 *Paige* 23; 8 *Pickering* 113; 10 *Yerger* 213.) Matter in avoidance must be proved. 1 *Munford* 373; 1 *Gill & Johns.* 272; 2 *Johns. Ch. R.* 89; 2 *Bibb* 38; 4 *Eng.* 532.

But, it is insisted that, by the terms of the title bond to Montgomery, on failure to pay at the time stipulated, the lot was to revert to Rogers and his heirs and assigns, and all improvements to be forfeited; and that, as Montgomery failed to pay according to stipulations, the right of Montgomery was forfeited.

Now, to say nothing of the rule, that courts of equity will never enforce a penalty or a forfeiture, or aid in divesting an estate for a breach of a covenant or condition subsequent, (2 *Story's Eq.* 1319; 4 *Johns. Ch. R.* 431; 1 *Peters* 232, 236,) and to lay aside the doctrine that time is not generally deemed in equity to be of the essence of the contract, (2 *Story's Eq.* 776,) it is not easy to perceive what claim Hardy has to avail himself of this forfeiture, supposing it to exist. If it was a right which Rogers could assign, he did not assign it, and, as has been already demonstrated, he did not sell the lot to Hardy, but actually excepted it; nor does it appear that the contract between Rogers and Montgomery was assigned, or transfered to Hardy, or that he had any right to it. If, in consequence of the failure to make payment, Rogers might have demanded the reversion of the lot, and insisted on the forfeiture; it is certainly true that he could waive

it, and, if it were necessary to establish a waiver, we should find abundant evidence of it in the quit claim deed, made by him to the complainants for the lot in controversy, and in his failure to answer the bill, and thereby confessing it, and submitting to a decree. This, then, is a defence with which Hardy does not appear to be connected, and of the benefit of which he could not avail himself, and it may be dismissed without further remark. In any view of the case, it does not appear to us that Hardy has any substantial reason to complain of the decree. It is true that he had no title to the lot in controversy to divest, and it would have been more appropriate to have enjoined him from setting up any title to it, and divested the title out of the other defendants, vested it in the complainants, and have pronounced a decree quieting the title. But the decree cannot operate injuriously to Hardy, and as we are satisfied that if we were to give him the lot in controversy, we should award him property, which it does not appear by this record he ever purchased, or to which he has any just claim, we shall direct the decree to be affirmed with costs.

WATKINS, C. J., did not sit in this case.