APPERSON & CO. VS. FORD ET AL.

The defendant purchased lands, for R., of S. and F. & B., agreeing with S. to stand in the place of R. if he did not ratify the purchase: R. declined to take the lands and conveyed them to the defendant, who assumed to pay and did pay the purchase money; the defendant was a member of the firm of F. & B., though not

OF THE STATE OF ARKANSAS. 747

Term, 1861.] Apperson & Co. vs. Ford et al.

interested in the lands at the time of the purchase, but afterwards retired from the firm, settling up his co-partnership business and accounting for the unpaid installments of the purchase money. Afterwards, F. & B. became indebted to the plaintiffs, who caused an attachment to be laid on the lands, bought them under execution, and filed a bill against the defendant, who was in possession of the lands, praying that his deed be canceled, and that the title be vested in them, on the ground that the sale was a contrivance to defraud the creditors F. & B :

*By the Court :* Upon a careful examination of the allegations and proof, we find no evidence showing that the defendant, who was not a voluntary grantee of the lands, and who had the right to take the place of S. as against the vendors, when he declined to take the lands, is chargeable with any fraud in the purchase of the lands, or with being engaged in any scheme to appropriate them to himself without consideration, or to the disadvantage of subsequent creditors of F. & B., or of any person.

*By Mr. Justice Fairchild :* A court of chancery will not interpose its assistance to support a mere legal right, but in two classes of cases—as where a judgment creditor being unable to make his debt by execution, seeks to subject to its payment a debt, or thing in action, or equitable right or interest, which the common law remedy cannot reach ; and where his judgment, or execution, is a lien on property covered by a fraudulent conveyance, or by a mortgage or incumbrance which he is willing to redeem or remove.

Where a party has purchased lands under a judgment and execution, which have been fraudulently conveyed to a third person, he may appeal to the suppletory jurisdiction of a court of chancery, asking that the deed be pronounced fraudulent, so that he may perfect his lien by legal proceedings.

It is apparent, upon principle and authority, that a bill setting forth a legal claim to lands of which the plaintiff is not in possession, against the claim of one in possession, cannot be sustained, either as a bill for general relief, or as a bill to remove a cloud from the title of the plaintiff under the *quia timet* jurisdiction of a court of chancery, though it allege that the title which clouds that of the plaintiff was a contrivance to defraud creditors.

The cases of *Ringgold vs. Waggoner,* 14 *Ark.* 69; *Mitchell vs. Etter,* 22 *Ark.* 184, and *Shell vs. Martin,* 19 *Ark.* 141, commented upon—the decrees in the first two approved, in the latter disapproved.

*Appeal from Phillips Circuit Court in Chancery.*

Hon. CHARLES C. FARRELLY, Special Judge.

WATKINS & GALLAGHER and GARLAND & RANDOLPH, for appellants.

PIKE and HEMPSTEAD, for the appellees.

Mr. Justice FAIRCHILD delivered the opinion of the court.

Previous to the 16th of December, 1853, Smith, and Ford & Brother, a commercial firm of Louisville, Ky., were joint owners of the lands that are the subject of controversy. William G. Ford, not one of the firm of Ford & Brother, on that day, made an agreement with the owners of the lands to purchase them for Reid, under which James W. Smith, and James Ford and Charles F. Ford, on the 4th of January, 1854, executed a deed for the lands to John Reid, for the expressed consideration of eleven thousand, four hundred and eighty dollars, one-fourth to be paid down, and the other fourths, in one, two and three years from the first of January, 1854. Reid declined to ratify the purchase, and on the 27th of January, 1854, he conveyed the lands to William G. Ford for the consideration of one dollar, the deed also containing this provision: "the lands above " described were, by deed, on the 4th January, 1854, conveyed " to the party of the first part by James W. Smith and James " Ford and Charles F. Ford, the consideration of said convey- " ance purporting to be for the sum of eleven thousand four " hundred and eighty-two 32-100 dollars, one-fourth of which " was in hand paid, and the balance to be paid in equal pay- " ments of two thousand eight hundred and seventy 58-100 " dollars; for which, it appears to be recited in the deed that " notes were executed payable in eighteen fifty-five, 1856 " and 1857: it is agreed between the parties to this indenture, " that the lands herein conveyed are liable for the payment of " the three notes above named; and in no event are the parties " of the first part to be held liable for the payment of the " same."

Ford & Brother acquired their title to one-half the lands in March, 1853. William G. Ford became associated with them as a partner in September, 1853, and so continued till May, 1854, when he withdrew from the business. The other members of the firm resumed their partnership name, and continued their operations till the 15th of January, 1855, when they made

an assignment for the benefit of their creditors, their liabilities largely exceeding their assets.

It does not appear from the record that Smith was advised of the refusal of Reid to accept the purchase which William G. Ford had made for him, till in May, 1854, when, as usual with Smith, he left his residence in Phillips county for Kentucky; but against this he was fortified, as, at the time of the sale of the lands, he required William G. Ford to stand in Reid's place, by taking the land should Reid not confirm the trade.

Smith, being indebted to Ford & Brother in a larger sum than his half of the lands would amount to, by arrangement between him, the firm and William G. Ford, on the 24th of May, 1854, was paid all that was coming to him on the lands by a credit upon the debt he owed to Ford & Brother : and upon the same day, the whole consideration for the lands was charged upon the books of Ford & Brothers, the style of the firm when the three brothers were in it, to William G. Ford, allowance being made to him, as well as to Smith, for the present payment of the installments that were not due till 1855, 1856 and 1857.

Upon the withdrawal of William G. Ford from the firm of Ford & Brothers, Ford & Brother, consisting as before of James Ford and of Charles F. Ford, upon the 27th of November, 1854, became indebted to the plaintiffs on a bill of exchange for sixty days, which, maturing after the failure of Ford & Brother, remained unpaid. To recover the amount due to them, the plaintiffs, on the 8th of March, 1855, commenced their suit of attachment against James Ford and Charles F. Ford in the Circuit Court of Phillips county, which was levied upon the lands in controversy as their property. In due course of law the plaintiffs obtained judgment and execution, bid off the lands at the sheriff's sale, obtained a deed for them, and filed their bill in this case : that the title for the lands be decreed to have vested in them by the attachment and the proceedings under it, and that the deed to William G. Ford be delivered up

by him and canceled by the court: to remove the cloud that it created upon the title of the plaintiffs.

To sustain the prayer for relief made against William G. Ford, the plaintiffs maintain that the lands, by the application of the demand of James Ford and Charles F. Ford upon Smith to the payment of his half of the lands, became their entire property: that the deed of Reid to William G. Ford was a voluntary conveyance, and that William G. Ford is a voluntary grantee, not only as to Reid, but also as to James Ford and Charles F. Ford, the real owners of the lands, inasmuch as the amount that was charged against William G. Ford for the lands was never paid: or that it was paid with funds that belonged to the creditors of Ford & Brothers, and could not therefore be drawn out of the firm as the individual property of William G. Ford, the withdrawing partner.

The plaintiffs also insist that the transfer of the lands from Smith and the two Ford's to Reid, and from Reid to William G. Ford, was a contrivance of the three Fords, by which the lands should be vested in William G. Ford as their nominal owner, so as to hold them in secret trust for James Ford and Charles F. Ford, or for himself, without regard to the rights of their creditors; and that the plaintiffs as creditors of Ford & Brother, having a claim to the lands, by their attachment and purchase thereunder, are entitled to have their sheriff's deed declared by decree to have invested them with the legal title to the lands, and that the deed of William G. Ford ought not to be permitted to stand to disquiet the plaintiffs, and to throw a cloud upon their title. On the other hand, the three Fords, defendants to the bill, deny all the charges of fraudulent act and intent with which the bill abounds, aver that the deeds to Reid and to William G. Ford were made in good faith, that William G. Ford, in taking the place of Reid, only did what he bound himself to Smith to do, if Reid should not fulfill the terms of the purchase that William G. Ford stipulated with Smith, and that William G. Ford made full payment for the lands. And upon the state of case as presented in the record, William G. Ford denies that the plaintiffs,

as subsequent creditors of James Ford and of Charles F. Ford, can make any valid claim upon the lands under their attachment, and also contends that if the plaintiffs have any right of action against him for the lands, it is one that must be prosecuted at law.

The Circuit Court of Phillips county sitting in chancery, dismissed the bill for being without equity, as William G. Ford was not a party to the bill of exchange upon which the plaintiffs obtained their judgment in the attachment suit, and was not a member of the firm of Ford & Brother, by whom the bill was accepted. The plaintiffs appealed.

Although William G. Ford was not liable on the bill of exchange, yet if he received a voluntary deed of lands belonging to James and Charles F. Ford, with the fraudulent intent of holding them free from the just demands of their subsequent creditors, the bill of the plaintiffs should not have been dismissed, unless upon the question of jurisdiction.

Although the point of jurisdiction seems not to have been presented by the pleadings, it was made before the Circuit Court, as we see from the printed arguments used before that court and furnished to us; and it is urged here, but in subordination to the denial of William G. Ford being a fraudulent grantee of the lands in controversy. Although it may be a subject of interest to William G. Ford to be discharged from imputations of fraud, in the form in which they are made, and of more importance to him, as urged by his counsel, than are the lands in dispute, yet we may not resolve ourselves into a tribunal of honor, and decide even legal questions when unnecessarily presented, that the result might be that, in our opinion, character had been heedlessly or maliciously traduced. The points which we undertake to consider, are, first: may a court of chancery determine the conflict between the the titles of the plaintiffs and of William G. Ford: and, upon all the facts in the record, which is the better title?

If the question of jurisdiction be answered adversely to the plaintiffs, nothing further is needful to be done, and we; therefore, first betake ourselves to the solution of this question.

In support of the objection, that the case is not within the jurisdiction of a court of chancery, it is assumed on the part of William G. Ford, that the bill, in setting up the title acquired by the plaintiffs under their attachment, and asking it to be decreed that the sheriff's deed invested the title to the lands in the plaintiffs, is in reality a bill to invoke the aid of a court of chancery to make valid a legal claim. And it is then argued that a court of chancery will not interpose its assistance to support a mere legal right, but in two classes of cases : as first, when a creditor has obtained judgment, issued an execution and can collect nothing thereby, but has information of a debt, or thing in action, or equitable right or interest, which ought to be subjected to the payment of the debt, but which the common law remedy cannot reach : and secondly, when a creditor has a judgment, or an execution, that is a lien on property that is covered by a fraudulent conveyance, or by a mortgage or incumbrance, which the creditor will redeem or remove by payment.

These are well established heads of equity jurisdiction, and are purely auxiliary to the satisfaction of legal rights by subjecting, in the first instance, that which a judgment debtor has, and which ought so to be applied to his ascertained debts; and in the second class of cases, by removing the fraudulent incumbrance, or permitting the creditor to discharge a prior lien so as to leave his legal charge in full force upon the property. The mode and principle of equitable assistance in these cases are briefly and clearly set forth in *Beck vs. Burditt*, 1 *Paige*, 308. See also *McDermott vs. Strong*, 4 *John.*, ch. 691, 692; *Angell vs. Draper*, 1 *Verm.*, 399; *Hadden vs. Spader*, 20 *John.*, 574.

When the plaintiff wishes to subject an equitable interest to the payment of his debt, he must show that he has resorted to the last legal remedy, by producing a judgment, an execution and a return of *nulla bona:* and when he wishes to redeem an incumbrance, or remove a fraudulent assignment, he must show the existence of his judgment, or execution lien. This appears

from the cases above cited, and is also well expressed in *Brink-erhoff vs. Brown*, 4 *John. Ch.* 676.

It is evident that the bill here does not present such a case as can successfully invoke the aid of chancery to enforce a legal right.

If the plaintiffs supposed that their attachment and judgment against Ford & Brother would bind the lands, and that the deed of William G. Ford was but an indirect fraudulent assignment of Ford & Brother, the case could have been brought within the suppletory jurisdiction of chancery, by asking that the deed be pronounced fraudulent, so that they could perfect their lien by legal proceedings. And when that had been done, the sheriff's sale would have conferred an interest that would be unaffected by the deed of William G. Ford. Or, if the plaintiffs had been advised that their judgment against Ford & Brother, was a personal demand, that the lands in controversy were equitably subject thereto, but could not be reached by execution from a court of law, a bill could have been framed to make any interest of Ford & Brother in the lands liable to the judgment.

The plaintiffs did not adopt either of these modes of relief, although of frequent exercise by courts of chancery, but proceeded to enforce their judgment and execution by sheriff's sale, at which they bought the lands, obtained a deed, and then came into a court of chancery, setting up their title, claiming it to be the legal title, and paramount to a claim that William G. Ford makes to the land, by virtue of the deeds of Smith, James Ford and Charles F. Ford, to Reid, and of Reid to him, as has been above mentioned. Chancery cannot then afford any relief that would fall within the exercise of its jurisdiction, auxiliary to courts of law; and any relief that can be extended to the plaintiffs, must fall under some head of independent jurisdiction. And this seems to be conceded by the plaintiffs, as, in answer to the objection of William G. Ford, they insist that it is founded on a mis-description of the bill; its object not being to ask of chancery aid, by acting in an auxiliary way to legal authority, but to protect their legal title by removing therefrom the cloud

48

which the adverse claim of William G. Ford tends to gather over it. For William G. Ford, it is then objected to this foundation of the bill, that no person but one in possession of land can sustain a bill to remove a cloud upon title, by cancellation of an opposing deed or claim. It seems to be taken for granted that the plaintiffs are not in the possession of the lands: they do not aver that they are, and holding a sheriff's deed, is no evidence of possession. Besides, it is in the record as testimony, but perhaps not as pleading, that the lands are in the possession of William G. Ford.

Considering, then, this case as the assertion of a legal claim to lands of persons not in possession, against the claim of one in possession, and the objection to the bill would seem, upon principle, to secure its overthrow. For, ordinarily, an action of ejectment affords the proper remedy for a person not in the possession of lands to which his right entitles him; and courts of law have the exclusive right of trying questions of mere legal title. And so are the authorities, as will appear from the following citations, beginning with a quotation from an opinion of Chancellor KENT. * * " And which this court, as not possessing any direct jurisdiction over legal titles, is not bound or authorized to assume. This court may, perhaps, try title to land when it arises incidentally: but it is understood not to be within its province, when the case depends on a simple legal title, and is brought up directly by the bill. The power is only to be exercised in difficult and complicated cases, affording peculiar grounds for equitable interference. This was the doctrine laid down by respondent's counsel on appeal, in the case of *Welby vs. Rutland*, 6 *Bro. P. C.* 575, and it appears to have been sanctioned by the court. The rule is now so understood, according to a late treatise on the principles and practice of the court of chancery. *Maddock's Chan.* 135, a work of merit and utility. This point was also discussed much at large, and emphatically laid down by Baron WOOD, and not denied by the other Barons, in the case of *The Attorney General to the Prince of Wales vs. St. Aubin*, 1

*Wightwick's Exch. Rep.* 184 *to* 238;" *Abbott vs. Allen,* 2 *John. Ch. Rep.* 524.

To the same effect is an extract from an opinion of the Supreme Court of the United States: " The bill in this cause is, in substance, and legal effect, an ejectment bill. The title appears by the bill to be merely legal; the evidence to support it, appears from documents accessible to either party ; and no particular circumstances are stated, showing the necessity of the court's interfering, either for preventing suits, or other vexation, or for preventing an injustice irremediable at law. In *Welby vs. Duke of Rutland,* 6 *Bro. P. C.* 575, it is stated that the general practice of courts of equity, in not entertaining suits for establishing legal titles, is founded upon clear reasons: and the departing from that practice, where there is no necessity for it, would be subversive of the legal and constitutional distinctions between the different jurisdictions of law and equity." *Hepp vs. Babin,* 19 *How.* 277.

In *Hamilton vs. Cummings,* 1 *John. Ch.* 520, 524, the English cases, upon the cancelation of writings, were examined, but those cases, as well as the one under consideration, related to matters of personal obligation, as notes and bonds for the payment of money, annuities, policies of insurance and the like: yet the general conclusion which the court announced, that chancery had jurisdiction to require instruments to be given up and canceled that were void in law, whether the matter that made them void was apparent on their face, or had to be established by other testimony, has been affected by this modification : that when the instruments are void on their face, chancery will not interfere to cancel them, not wishing to exercise its power unnecessarily, in doing what a court of law will do, whenever the void instrument is brought forward to sustain an action. The other part of the general doctrine of *Hamilton vs. Cummings,* that an instrument will be canceled by chancery, which is void at law, but which is apparently good, remains in force, and may apply to title papers, as well as to bonds and papers that witness personal contracts. *Piersoll vs. Elliott,* 6 *Pet.* 98; *Morse vs. Garner,*

*Mar. & Yerg.* 384; *Gamble vs. St. Louis,* 12 *Misso. Rep.* 620; *Gray vs. Mathias,* 5 *Ves.* 294; *Simpson vs. Lord Howden,* 3 *M. & C.* 102, 108; 2 *Story's Eq.,* sec. 700, *a; Cox vs. Cleft,* 2 *Comst.* 122; *N. Y. & N. H. R. R. Co. vs. Schuyler,* 17 *N. Y. R.* 599; *Van Doren vs. Mayor N. Y.,* 9 *Paige* 389.

Such is the law, as stated in general terms, but it is equally emphatic when applied to bills that do not show possession of lands in the plaintiffs, but are sought to be supported by appeal to the *quia timet* jurisdiction of chancery.

This question arose in a case before the Court of Appeals of Kentucky, upon which the court remarked, that though bills of this character were always received in courts of equity with great caution, yet if the title of the plaintiff was admitted, the bill might be entertained, without the establishment of the title at law, as a party might be disturbed in his possessions, but not to the extent that would enable him to have his right tried at law, whence the necessity for a bill of repose. But the court held, further, in this wise: " to enable the court, however, to extend relief to Gray, it is not enough that he is in possession, it is essential that his possession should be connected with a legal or equitable title. If he has no title, he can have no claim to the conscience or justice of a court of equity. For a violence committed on his possession by a person having no title, he might sustain an action at law: but we know of no case, and can perceive no principle, which can warrant the interposition of a court of equity, by giving relief to a complainant possessing no title." *Trustees of Louisville vs. Gray,* 1 *Litt.* 148.

In accordance with this principle, in answer to an objection that a plaintiff, wishing to have a sheriff's deed removed as a cloud upon his title, must show a perfect title, the Court of Appeals of New York decided, that one in possession, under a conveyance from a mortgagee, could maintain the action, as his title was good against the grantee of the sheriff's deed, and all claimants except the mortgagor. But the court never entertained the notion, that a person, out of possession, could sustain an action for the removal of a cloud upon his title, and thereby obtain possession;

for it said, that the objection would be good, if a plaintiff was claiming title, and seeking upon it to recover possession. *Croft vs. Merrill,* 14 *N. Y. R.* 460, per JOHNSON, J., and 464, per DENIO, C. J.

So, in another and later case, the same court held that the owner of land, by virtue of a resulting trust, might sustain an application for canceling the certificate of a sheriff's sale of the land as belonging to the person having the legal title, because the plaintiff having the equitable title was the real owner of the land, and had it in possession. *Loundsbury vs. Purdy,* 18 *N. Y. R.* 515.

The two cases last referred to, and *Radcliff vs. Rowley,* 2 *Barb. Ch. Rep.* 31; *De Peyster vs. Hildreth, ib.* 113, and *Allen vs. Hightower,* 21 *Ark.* 316, are instances of claims, made under sheriff's sales, being attacked as clouds upon title, but no instance has fallen under our observation, in which it has been held against the objection of a defendant, that a plaintiff claiming title under a sheriff's deed, and not in possession, has obtained a hearing in a court of chancery, either to obtain possession, or to have his claim compared with the title that is connected with the possession.

The Court of Appeals of Kentucky, in a later case than the one before cited, use this language : "The holder of the legal title, not in actual possession, cannot, as a general rule, maintain a bill to quiet his title and to compel a relinquishment of adverse claims." *Harris vs. Smith,* 2 *Dana,* 11.

The Supreme Court of Illinois, after citing with approbation *Trustees vs. Gray,* and *Hollis vs. Smith,* pursue the subject in this way : "The reason why the party out of possession cannot maintain such a bill is, that he may bring an action at law to test his title, which, ordinarily, a party in possession cannot do. Such a bill is only entertained by a court of equity, because the party is not in a position to force the holder of, or one claiming to defend under, the adverse title, into a court of law to contest its validity ; and this, as a general rule, is the test to which a court of equity will look to determine whether the necessity of the

case requires its interference." *Alton Marine & Fire Insurance Co. vs. Buckmaster*, 13 *Ill. R.*, 205.

"It is only parties in possession, or who hold some future estate which gives them no right to immediate possession, upon whom any necessity rests of resorting to a court of equity for aid to remove a cloud from their title. But when they have the right to immediate possession, the common law action of ejectment, as it was formerly called, with a trial by jury, is the proper remedy." *Ward vs. Dewey*, 16 *N. Y. R.*, 529.

"Those only who have a clear, legal, and equitable title to land connected with possession, have any right to claim the interference of a court of equity to give them peace or dissipate a cloud on the title." *Orton vs. Smith*, 18 *How.*, 265. See also *Armitage vs. Wickliffe*, 12 *B. Mon.*, 494.

The reference to authorities is closed with the following extract from *Haythorn vs. Motgerem*, 3 *Halst. Ch. R.*, 342. "A party in possession may come into this court under proper circumstances, to remove a cloud from his title. But I am not aware that a party out of possession can come here as against another in possession, and claiming title under a deed, and obtaining a decree declaring the defendant's deed void, and putting the complainant in possession and giving him an account of the rents and profits."

It is thus apparent upon principle and the authorities cited, that the bill in this case cannot be sustained as a bill to remove a cloud from the title of the plaintiffs. To do so, would open the door of chancery to every case where a plaintiff might assert a claim to land, and aver that the title of the defendant in possession was beclouding his claim, and ask that his title be declared to be the real title, that it be established and quieted, and the possession transferred to it by decree of the court. It is not very plain what is a cloud upon title, in the language of the books, that may be canceled, and the authorities refer to the indefiniteness of the term. *Wait vs. Dewey*, 16 *N. Y. R.*, 529 ; *Mayor of Brooklyn vs. Miserole*, 26 *Wend.*, 137. Nor do the facts of this case require us to enter into an investigation of what may constitute it, or what has been decided to be so in the various

cases found under this head; but it is plain that when a party may resort to an action of ejectment to test his title, or obtain the possession that belongs to his title, that is a fatal objection to his prosecution by bill for quieting his own title. The foundation of the *quia timet* jurisdiction of chancery is the apprehension of injury that a party may receive from the assertion of a claim which he has no means of procuring to be tried in the ordinary tribunals of the law. It cannot be admitted that every case of contested title to land at the pleasure of the claimant be brought into a forum, whose special offices are far different from the examination of disputed titles to real estate.

It is, however, insisted for the plaintiffs that this question ought not to be discussed, and cannot be considered in this court, since the cases of *Ringgold vs. Waggoner*, 14 *Ark.*, 69, *Shell vs. Martin*, 19 *Ark.*, 141, and *Mitchell vs. Etter*, 22 *Ark.*, 183, are contrary to the conclusion before stated. If, upon examination of these cases, we agree with the counsel of the plaintiffs in what they decide, it will then be in good time to determine whether we shall adhere to erroneous determinations of this court, or declare the law in this case as, upon sound principle and unquestionable authority, we find it to be.

In *Ringgold vs. Waggoner*, the judgment of Ringgold against John Waggoner was declared by this court to be a lien upon the lands in controversy between Ringgold and Burr, and that the only other question in the case was, whether Burr could hold the lands as their bona fide purchaser. The question that has been considered in this case was not considered in *Ringgold vs. Waggoner ;* and that is no conclusion against the conclusion reached in this case. The foundation of Ringgold's title was his judgment lien; and the lands being subject to the lien, could not, of course, be transferred from its operation. On this footing the case was submitted to this court on the part of Ringgold, and was decided on this ground, no argument being made here on behalf of Burr. But it is undeniable that the proper remedy of Ringgold to enforce his lien was, to have invoked the aid of chancery to remove the fraudulent assignment of John Waggoner, and the subsequent

conveyance of Edmund Waggoner to Burr, and then to have proceeded to execution and sale of the lands to satisfy his judgment; thus bringing the case within the second class of cases before mentioned, in which chancery acts as an auxiliary to enforce a legal right.    But it is enough to say of that case, that it does not conflict with our view of the law as expressed in this case.

The general doctrine upon this subject is well expressed in *Shell vs. Martin*, and would have been applicable to that case, if the bill had shown the possession of the land to have been in the plaintiffs, instead of averring it to be in the defendant.  The attention of the court seems to have been called only to the recognition of the jurisdiction of chancery to cancel deeds, which, if left outstanding, would cloud the real title, without reference to the controlling fact that the jurisdiction is exercised to strengthen and protect the title that is connected with actual possession.    The general terms used in the opinion affirming the jurisdiction are correct, but the application of the principle to the facts of the case was evidently wrong.  The authorities that are cited in *Shell vs. Martin* only support, in general terms, the jurisdiction of equity to cancel personal obligations and instruments of title; not one of them intimates in terms, nor do the facts imply, that the jurisdiction has been or can be exercised, but to protect title accompanied by possession, except the *Chautauque County Bank vs. White*, 6 *Barb.*, 605.  That was a contest between purchasers at a sheriff's sale as plaintiffs, and the defendant, a purchaser at a sale made by the receiver acting under the direction of a court of chancery.   The sale of the receiver was prior in time, and the defendant was in possession under the sale.  The bill prayed that the judgment under which the sheriff's sale was had might be decreed to be a lien upon the premises existing when the defendant bought at the sale of the receiver, that the title of the plaintiffs might be declared superior to that of the defendant, and that the defendant should be required to surrender the possession of the premises to the plaintiffs.   The vice-chancellor, before whom the case was brought, dismissed the bill, but the Su-

preme Court reversed his decree, and held that the plaintiffs could entertain their bill, on the ground that the deed of the receiver to the defendant was a cloud upon their title, and this is the decision that is cited in *Shell vs. Martin*, and also in *Mitchell vs. Etter*. But the decree of the Supreme Court was reversed by the Court of Appeals; and though there were other points in the case, GREDLEY, J., expressly denied the right of the plaintiffs to go into equity to set aside the deed of the defendant as a cloud on their title. *Chautauque Co. Bk. vs. White*, 2 *Seld.*, 246. An action of ejectment was said by the Judge to afford the proper remedy for the plaintiffs; yet it is but just to say that, in both courts, the fact of the defendant being in possession does not seem to be insisted upon, the Court of Appeals holding that the alleged defect of the defendant's title was apparent upon its face, and that, therefore, there was no need for the plaintiffs to ask the aid of equity to cancel the deed of the receiver to the defendant. This is according to the received doctrine that has overruled *Hamilton vs. Cummings*, 1 *John. Ch.*, so far, and is an express authority that an action of ejectment, instead of a bill to remove clouds, is the remedy to recover land for a plaintiff out of possession.

The Circuit Court, in *Shell vs. Martin*, properly sustained the demurrer to the bill, and this court in reversing its decree, therefore, undoubtedly made a wrong application of a correct principle of law.

In *Mitchell vs. Etter*, no authorities were referred to but what were cited in *Shell vs. Martin*, but that case itself and any general observations that may be in the opinion, should be confined to the facts of the case under consideration, if they can be so by any rule of reasonable construction. *Conway vs. Reyburn*, 22 *Ark.* 293. And upon the facts of the case, in *Mitchell vs. Etter*, it was rightly decided that the plaintiffs could maintain a bill for cloud of title against the defendants. For the wife of Mitchell held the lands in controversy by a valid title, and though being wild lands, this court therefore considered them not to be in the actual·

possession of Mrs. Mitchell, before her marriage with Mitchell, or afterwards in the actual possession of Mitchell and wife, yet it does not thereby follow but that the title of Mrs. Mitchell carried with it the possession of the lands. As against third persons, who were intruders upon the lands, the title would draw to it a constructive possession that would enable Mitchell and wife to maintain ejectment, or tresspass; and the claim of the defendants as purchasers at a tax sale, like that of purchasers of sheriffs and officers that make compulsory sales of lands, does not attach to itself a constructive possession. *Crutsinger vs. Catron*, 10 *Humph.* 27, 28. Such persons must prove possession by possessory acts; it will not, as in ordinary cases of ownership, be presumed to be with the title. Mitchell and wife, though not in actual occupancy of the lands, might be construed to be in possession of them, and could not then maintain ejectment, and could, as in possession, file their bill to cancel a tax deed of the defendants as a cloud upon Mrs. Mitchell's title. The distinction between occupation, or what this court, in *Mitchell vs. Etter*, and in *Fowler vs. Keatts*, 22 *Ark.* 487, termed actual possession, is noticed by Selden J., in *Ward vs. Dewey*, 16 *N. Y. R.* 531, who says that there is a distinction between occupation and possession, and that there may be a legal or constructive possession where there is no actual occupation. Or without distinction between occupation and possession, or between actual and constructive possession; and taking neither party in *Mitchell vs. Etter*, to have been in any sort of possession, then Mitchell and wife were without remedy at law, and without any means to test the opposing title of the defendants, but by complaining of it in chancery, as a cloud upon their title, and that fact alone would give jurisdiction. *Mattingley vs. Corbit*, 7 *B. M.* 376.

Hence, it follows, that in any state of the case, *Mitchell* and *Etter* is well sustained upon principle, its decision not being inconsistent with the principle adopted in this case, though some general observations of the opinion are more accordant with *Shell vs. Martin* than with this case, owing to the lead of that

case, and to the point decided in this case not being made before the court.

As the grant of chancery jurisdiction to our Circuit Courts is constitutional, and cannot be limited by legislative enactment without the establishment of separate chancery courts, it is important that the jurisdiction should not be enlarged by the courts beyond its proper bounds. These are to be determined from the decisions of courts exercising chancery jurisdiction, and from them it has been shown, that as a mere question of conflicting titles between the parties to this suit, the plaintiffs not being in possession of the lands in controversy, the Circuit Court of Phillips county in chancery had no jurisdiction of the case.

And although no objection is taken in the pleadings to the exercise of the jurisdiction by the Circuit Court, still, if it had no jurisdiction, the suit should not have been retained before the court for the want of the proper objection being made. *Heyer vs. Burger, Hoff. Ch. R.* 7; *Foley vs. Hill,* 1 *Phillips R.* 407; *Hipp vs. Babin,* 19 *How.* 278.

But, notwithstanding the authorities just cited are very pointed, it has been held by Chancellors KENT and WALWORTH, though more decidedly by the latter, that the objection to the jurisdiction of chancery, on the ground of a full and adequate remedy at law, should be made before the hearing upon the merits, otherwise it would be disregarded if chancery was competent to afford the desired relief. *Underhill vs. Van Courtlandt,* 2 *John. Ch.* 369; *Granden vs. LeRoy,* 1 *Paige* 509.

Although we cannot perceive the reasonableness of the distinction so strongly taken by Chancellor WALWORTH, for the fact of the existence of an adequate, legal remedy, seems to be as strong a bar to the exercise of chancery jurisdiction as can be conceived, yet the authority of those names is very great, and on account of the doubt thus begotten of the propriety of disposing of this case upon the question that has been discussed, and for two other reasons, we shall proceed to test the decree of the Circuit Court sitting in chancery, upon the question that the parties unite in consid-

ering the main question in the case, that is, the alleged fraudu-lent character of William G. Ford's title.

This fraudulent imputation is one of these two reasons; and relief against a deed alleged to be fraudulent, has been held to be a proper case for equitable jurisdiction, though fraud is exam-inable at law as well as in equity. *Apthorpe vs. Comstock, Hopk. Ch. R.* 148; *Comstock vs. Apthorpe,* 8 *Cow.* 386; *Apthorpe vs. Comstock,* 2 *Paige* 483.

The other question of jurisdiction was considered as if the deeds of the parties were merely conflicting title as was the case of *Mitchell vs. Etter,* and as this case was presented in argument, unconnected with any charge of fraud against William G. Ford. We would not assume as a general principle, that a mere alle-gation of fraud will permit a party claiming title and out of pos-session, to seek his remedy in equity rather than by a resort to the action of ejectment, but in combination with 'the other reasons operating upon us, it induces us not to dismiss the bill for want of jurisdiction in the Circuit Court sitting as a court of chan-cery.

The other reason inclining us to consider the case upon its merits, that is, to decide whether William G. Ford holds the land in fraud of the rights of the plaintiffs, is the right of this court to examine and decide every question presented by the record. In this case, the Circuit Court entertained jurisdiction of the bill, tried the case upon its merits; hence, though we had doubts of the jurisdiction, or were clear against the right of its exercise by the court below, we may, as the court did, look into the record and decide the matters presented by it, waiving the question of jurisdiction. This position is strongly supported by *Drew Scott vs. Sandford,* 19 *How.* 428, 429, *and the opinion of Wayne J.* 455, 456. And there is a manifest propriety in pursuing such a course in this case, as the parties have urged the allegation of fraud against William G. Ford, as the great matter of interest and of importance; and because, if we arrive at the same conclu-sion that the court below seems to have reached, its decree dis-missing the bill for want of equity, but without prejudice, should

be modified so as to operate as a final bar to the claim of the plaintiffs.

Although we have examined the immense record, made up of allegations and proofs, whose design was to fasten the charge of fraud upon William G. Ford, and to exculpate him therefrom, with the care, that the assumed, as well as the actual importance of the case, and of the subject, seemed to require, we shall only announce the conclusions to which we have come.

All the testimony that details the dealings of Ford and Brother with which William G. Ford is not proved to have taken a part, is thrown out of the case as irrelevant. It might not have been improper to have taken such testimony in reasonable amount, with the expectation of being able to connect William G. Ford with the transactions of Ford & Brother. If this had been done, the evidence would have been competent, and it would have been incumbent on us to have pronounced upon their character as fraudulent or otherwise. But after September, 1854, the date of the withdrawal of William G. Ford from the firm of Ford & Brothers, he was a stranger to the transactions of Ford & Brother, he must be taken to be so, because the plaintiffs have not proved otherwise. The witnesses themselves who dealt with Ford & Brother, from September, 1854, till the failure of the firm, and who suffered by it, furnish the proof that William G. Ford was not known, or supposed to be concerned in the dealings to which they depose. All of this sort of testimony, which is the great mass of the evidence in the case, cannot be taken into consideration.

And this testimony being out of the case, as disconnected with the acts of William G. Ford, of that which remains, there is nothing tending to show a combination on his part with Ford & Brother to defraud the plaintiffs, or any subsequent creditors of the firm, and no question is made in the case, that existing creditors were intended to be, or were, in fact, defrauded. Nor was William G. Ford a voluntary grantee of the lands conveyed to him by Reid. When Reid declined to take the lands, William G. Ford had a right to take the place of Reid as against Smith and the Fords, and he had a right to do so against the existing credi-

tors of Ford & Brother, if the conveyance was taken in good faith, or payment of a fair consideration, by placing the amount paid into the general assets of Ford & Brother, or by appropriating the price of the lands to the payment of their debts. And the case, as shown by the testimony of Smith and James Ford, that William G. Ford was to take the lands himself, if Reid did not, does not make William G. Ford a voluntary holder, nor show any fraudulent contrivance.

We have looked, with much minuteness, into the testimony upon the payment of the lands, and found that William G. Ford fully paid for them the sum that Reid was to have paid, had he accepted the deed from Smith, and James and Charles F. Ford, by moneys paid and advances made to James Ford and Charles F. Ford, which were applied and used in the business of the firm of Ford & Brothers. The testimony of the two Fords and of Johnson, the only persons shown to have any personal knowledge of the facts, abundantly prove this; nor can we accede to the proposition that the accounts from the books of Ford & Brother show any other result. If the fact be, as the counsel for the plaintiffs would have it, that the books show no indebtedness to William G. Ford, we cannot so see it; and if it also be, that, by what counsel call "a familiar mystery in the art of double-entry," the account is "unsatisfactory and unintelligible," the charge of fraudulent conspiracy with Ford & Brother, is not thereby sustained against William G. Ford. If we are to give credit to testimony, and not to decide upon the conjectural results, that counsel so plainly see, or upon the criminations of pleading, which, if true, would have been scandalous, but which are not shown to be true, we must hold that William G. Ford made full payment for the lands. Whether he paid on the 4th of January, 1854, or on the 24th of May ensuing, or at any intermediate time, or at any other time before the existence of the debt of Ford & Brother to the plaintiffs, is not material.

The note of Mr. Eden to *Andrews vs. Maltby*, 4 *Bro. C. C.* 429. *note a; Ex parte Ruffin*, 6 *Ves.* 119; *Ex parte Fell*, 10 *Ves.* 347; *Ex parte Williams*, 11 *Ves.* 3, contain much stronger law

OF THE STATE OF ARKANSAS. 767

Term, 1861.]          Apperson & Co. vs. Ford et al.

for the right of retiring partners to property that was joint property, than need be applied to sustain the right of William G. Ford.

The plaintiffs being subsequent creditors of Ford & Brother, their demand, dating back only to the 27th of November, 1854, the deed to William G. Ford cannot be fraudulent as to them, unless it had been a voluntary deed.

But waiving any legal question that might be urged upon this part of the case, the evidence fails to show wherein William G. Ford is chargeable with any fraud in the purchase of the lands, or with being engaged in any scheme to appropriate them to himself without consideration, or to the disadvantage of any person. Though he took the lands from the assets that would have been subject to the liabilities of Ford & Brother, he left in their stead ample means, and no creditor could claim that both the lands and their value should remain in the assets of the firm. If William G. Ford was personally liable to the creditors of Ford & Brothers, that is a question that does not arise in this case.

It is not for us to remark upon the character of transactions, when brought under review as a part of a case, further than the decisions of the law upon the facts may require or justify; and so all we feel compelled to say is, that no act of William G. Ford, in relation to the lands, appears to us necessary to be ascribed to any improper motive, or, to speak more in legal phrase, to be tainted by any fraudulent design. If there were fraud in the transaction, the plaintiffs have not made it clear: nor have they adduced facts that, in our minds, beget the suspicion of its existence, although the record shows that industrious, if not pertinacious, efforts have been made by them to establish their charges of William G. Ford's fraudulent complicity with the other Fords.

That Ford & Brother began the commission business with moderate means; that William G. Ford was their partner from September, 1853, to May, 1854; that he went in and went out of the firm without settlement or statement of the business; that Ford & Brother, in the latter part of the fall of 1854, and up to the time of their failure, traded outside of the line of their busi-

ness, and unskilfully or recklessly : these, and more other of the alleged incidents of this voluminous case, abounding in events, do not make good the existence of a scheme which the plaintiffs charge to have been devised, before the 4th of January, 1854, to place the lands in the hands of William G. Ford to the prejudice of creditors that only became so on the 27th of November, 1854.

Reid and William G. Ford may not have understood each other; for Reid, although he admitted conversations in which he had solicited the assistance of William G. Ford in procuring a southern plantation, did not consider that he had authorized the purchase made for him ; but nothing was more direct and free from suspicion than the subsequent transfer of the lands from Reid to William G. Ford. If Reid had taken the lands, there could have been no charge of fraud made against him, none that he was colluding with Ford and Brothers to defraud their creditors. When William G. Ford was substituted in his place, nothing but after fraudulent conduct could subject him to any fraudulent imputation. No such fraudulent conduct is made to appear.

The case would bear much comment; it is laden with facts that have been subjected to the severe construction that counsel felt obliged, or at liberty to assume, or to endeavor to show, as the proper imputation of acts from which they would have fraud inferred.

The decree of the court below was right in dismissing the bill, but it should not have been without prejudice—should have been absolutely : with this change, let it be affirmed.

Mr. Chief Justice ENGLISH and Mr. Justice COMPTON.

In so much of the above opinion as relates to the question of fraud, and in the conclusion, we concur, reserving any expression of our views as to the question of jurisdiction.